# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL ASSOCIATION OF THE DEAF, on behalf of itself, C. WAYNE DORE, CHRISTY SMITH, LEE NETTLES, and DIANE NETTLES, on behalf of themselves and a proposed class of similarly situated persons defined below,

        Plaintiffs,

    v.

HARVARD UNIVERSITY and the PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

        Defendants.

Civil Action No. 3:15-CV-30023-MGM

## MEMORANDUM IN SUPPORT OF MOTION TO STAY OR DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    A.    NAD's "Caption Or Remove" Claims. ................................................. 3

    B.    Putting NAD's Complaint Into Context:  The "Countervailing Considerations" Of "Caption Or Remove." ............................................ 5

ARGUMENT ....................................................................................................... 9

I.    THIS ACTION SHOULD BE STAYED OR DISMISSED PURSUANT TO THE PRIMARY JURISDICTION DOCTRINE. ................................... 9

    A.    Primary Jurisdiction Permits Courts To Stay Or Dismiss Actions Requiring Resolution Of Issues That Have Been Placed Within The Special Competence Of An Administrative Agency. ............................ 9

    B.    DOJ Soon Will Issue Regulations As To Whether, How And Under What Circumstances Websites And Online Videos Should Be Made Accessible. ...................................................................................... 10

        1.    DOJ's Proposed Regulations Likely Will Address A Number Of Difficult Policy Concerns. ................................................. 11

        2.    DOJ's Regulations Likely Will Address Most, If Not All, Of The Issues Implicated In NAD's Complaint. ............................ 14

    C.    DOJ Expertise Is Necessary To Unravel Intricate, Technical Facts As To Whether, How And Under What Circumstances Websites And Online Videos Should Be Made Accessible. .................................... 15

    D.    DOJ's Action Materially Will Aid The Court In Determining Whether, How And Under What Circumstances Websites And Online Videos Should Be Made Accessible. ........................................................... 16

II.    NAD'S SECTION 504 CLAIM SHOULD BE DISMISSED. ...................... 18

    A.    NAD Cannot State A Claim Based On Section 504's Facilities Access Rules. ..................................................................................... 20

    B.    NAD Cannot State A Claim Based On Section 504's Postsecondary Education Rules. .............................................................................. 21

      C.      The Dear Colleague Letter And Its FAQs Do Not Mandate A "Caption Or Remove" Approach To Effective Communication. ......................... 25

III.     NAD'S ADA TITLE III CLAIM SHOULD BE DISMISSED. ....................................... 27

      A.     NAD's Title III Claim Must Be Dismissed Because DOJ Has Not Yet Promulgated Standards Addressing Website And Online Video Accessibility ......................................................................................................... 28

            1.      Title III Contains Specific Rules Governing Facility Construction, Alteration And Barrier Removal; In The First Circuit, Websites Are "Facilities" And Are Governed By These Rules. ....................................................................................... 28

            2.      NAD Cannot Establish That Online Videos On Harvard Platforms Violate Title III's Construction, Alteration And Barrier Removal Rules. ............................................................................. 30

      B.     Title III Does Not Require Harvard To Create Or Provide Captioned Videos. ................................................................................................. 32

CONCLUSION ....................................................................................................................... 35

## TABLE OF AUTHORITIES

### Cases

*Access Now, Inc. v. Southwest Airlines, Co.*,
  227 F. Supp. 2d 1312 (S.D. Fla. 2002) .................................................................. 35

*Alexander v. Choate*,
  469 U.S. 287 (1985) .................................................................................................. 5

*Am. Tel. & Tel. Co. v. IMR Capital Corp.*,
  888 F. Supp. 221 (D. Mass. 1995) ........................................................................ 19

*Ass'n of Irritated Residents v. Fred Schakel Dairy*,
  634 F. Supp. 2d 1081 (E.D. Cal. 2008) ................................................................. 12

*Bauer v. Muscular Dystrophy Ass'n, Inc.*,
  268 F. Supp. 2d 1281 (D. Kan. 2003) ..................................................................... 6

*Board of Education v. Rowley*,
  458 U.S. 176 (1982) ................................................................................................ 29

*Brown v. Secretary of Health & Human Servs.*,
  46 F.3d 102 (1st Cir. 1995) .................................................................................... 11

*Burkhart v. Washington Metro. Area Transit Auth.*,
  112 F.3d 1207 (D.C. Cir. 1997) ............................................................................. 40

*Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association
  of New England, Inc.*, 37 F.3d 12 (1st Cir. 1994) .................................................. 3

*Clark v. Time Warner Cable*,
  523 F.3d 1110 (9th Cir. 2008) ............................................................................... 11

*Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co.*,
  765 F.3d 1205 (10th Cir. 2014) ............................................................................. 37

*Colo. Cross-Disability Coalition v. Too, (Delaware), Inc.*,
  344 F. Supp. 2d 707 (D. Colo. 2004) ..................................................................... 34

*Cullen v. Netflix, Inc.*,
  2015 U.S. App. LEXIS 5257 (9th Cir. Apr. 1, 2015) (unpublished) ...................... 35

*Disabled in Action of Pa. v. Sykes*,
  833 F.2d 1113 (3d Cir. 1987) ................................................................................. 23

*Doe v. Mut. of Omaha Ins. Co.*,
 179 F.3d 557(7th Cir. 1999) ................................................................ 42

*Dudley v. Hannaford Bros. Co.*,
 333 F.3d 299 (1st Cir. 2003)................................................................. 6

*Env. Defense Fund v. Environmental Protection Agency*,
 852 F.2d 1316 (D.C. Cir. 1988)........................................................... 17

*Fiedler v. Ocean Props., Ltd.*,
 683 F. Supp. 2d 57 (D. Me. 2010) ....................................................... 6

*Figy v. Amy's Kitchen, Inc.*,
 37 F. Supp. 3d 1109 (N.D. Cal. 2014) ................................................. 11

*Ford v. Schering-Plough Corp.*,
 145 F.3d 601 (3d Cir. 1998) ................................................................ 35

*George v. Bay Area Rapid Transit*,
 577 F.3d 1005 (9th Cir. 2009) ............................................................. 31

*Godbey v. Iredell Mem'l Hosp., Inc.*,
 2013 U.S. Dist. LEXIS 117129 (W.D.N.C. Aug. 19, 2013)................. 28

*Gonzales v. Oregon*,
 546 U.S. 243 (2006)............................................................................. 31

*Greater Los Angeles Agency on Deafness Inc v CNN, Inc.*,
 742 F 3d 414 (9th Cir 2014) ................................................................ 14

*Greater Los Angeles Council on Deafness, Inc. v. Community Television of S. Cal.*,
 719 F.2d 1017 (9th Cir. 1983) ............................................................. 23

*Harris v. Stonecrest Care Auto Ctr., LLC*,
 472 F. Supp. 2d 1208 (S.D. Cal. 2007)................................................ 6

*Heinrichs v. Wells Fargo Bank, N.A.*,
 2014 U.S. Dist. LEXIS 72713 (N.D. Cal. Apr. 15, 2014) ................... 12

*Jancik v. Redbox Automated Retail, LLC*,
 2014 U.S. Dist. LEXIS 67223 (C.D. Cal. 2014)................................... 41

*Jimenez v. Almodovar*,
 650 F.2d 363 (1st Cir. 1981)................................................................ 33

*Kappelmann v. Delta Air Lines, Inc.*,
 539 F.2d 165 (D.C. Cir. 1976) ............................................................. 11

*Karczewski v. K Motors, Inc.*,
    2015 U.S. Dist. LEXIS 45226 (S.D. Cal. March 21, 2015)...................................................... 17

*Kohler v. Flava Enters.*,
    779 F.3d 1016 (9th Cir. 2015) ............................................................................................ 38

*Kramer v. Midamco*,
    656 F. Supp. 2d 740 (N.D. Ohio 2009)................................................................................ 6

*Loye v. County of Dakota*,
    625 F.3d 494 (8th Cir. 2010) ................................................................................................ 5

*Mashpee Tribe v. New Seabury Corp.*,
    592 F.2d 575 (1st Cir. 1979)................................................................................................ 12

*Massachusetts v. Blackstone Valley Elec. Co.*,
    67 F.3d 981 (1st Cir. 1995).................................................................................................. 12

*Massachusetts v. E\*Trade Access, Inc.*,
    2005 U.S. Dist. LEXIS 22621 (D. Mass. Feb. 22, 2005) ................................................. 20

*McNeil v. Time Ins. Co.*,
    205 F.3d 179 (5th Cir. 2000) .............................................................................................. 42

*Miller v. Cal. Speedway Corp.*,
    536 F.3d 1020 (9th Cir. 2008) ............................................................................................ 37

*N. Cnty Commc'ns Corp. v. Cal. Catalog & Tech.*,
    594 F.3d 1149 (9th Cir. 2010) ............................................................................................ 18

*Nader v. Allegheny Airlines*,
    426 U.S. 290 (1976)............................................................................................................ 11

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*,
    2011 U.S. Dist. LEXIS 130443 (D. Mass. Nov. 10, 2011) .................................................. 21

*Nat'l Fed'n of the Blind v. Scribd, Inc.*,
    2015 U.S. Dist. Lexis 34213 (D. Vt. March 19, 2015).......................................................... 36

*Oja v. U.S. Army Corps of Eng'rs*,
    440 F.3d 1122 (9th Cir. 2006) .............................................................................................. 6

*Oliver v. Ralph's Grocery Co.*,
    654 F.3d 903 (9th Cir. 2011) .............................................................................................. 37

*Parker v. Metropolitan Life Ins. Co.*,
    121 F.3d 1006 (6th Cir. 1998) (en banc) ............................................................................ 35

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001)................................................................................................ 6

*Regents of University of Michigan v. Ewing*,
   474 U.S. 214 (1985).............................................................................................. 27

*Reno v. ACLU*,
   521 U.S. 844 (1997)................................................................................................ 5

*Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority*,
   718 F.2d 490 (1st Cir. 1983)................................................................................ 23

*Rymes Heating Oils, Inc. v. Springfield Terminal Ry. Co.*,
   358 F.3d 82 (1st Cir. 2004).................................................................................. 11

*Snyder v. Lady Slings the Booze, LLC*,
   2014 U.S. Dist. LEXIS 176992 (W.D. Ky. Dec. 23, 2014).................................. 38

*Southeastern Community College v. Davis*,
   442 U.S. 397 (1979).............................................................................................. 22

*Theriault v. Flynn*,
   162 F.3d 46 (1st Cir. 1998).................................................................................. 40

*Thomas v. Nw Airlines Corp.*,
   2011 U.S. Dist. LEXIS 91149 ( E.D. Mich. Aug. 16, 2011)................................ 38

*Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth.*,
   382 F.3d 412 (3d Cir. 2004) ................................................................................ 22

*United States v. Nat'l Amusements, Inc.*,
   180 F. Supp. 2d 251 (D. Mass. 2001) ................................................................. 20

*United States v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963).............................................................................................. 10

*United States v. Western Pac. R.R. Co.*,
   352 U.S. 59 (1956)................................................................................................ 10

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) ............................................................................. 35

*Wynne v. Tufts Univ. Sch. of Med.*,
   932 F.2d 19 (1st Cir. 1991) (en banc).................................................................. 22

*Wynne v. Tufts Univ. Sch. of Med.*,
   976 F.2d 791 (1st Cir. 1992)................................................................................ 28

**Statutes**

29 U.S.C. § 794 ................................................................................................ 1

29 U.S.C. § 794(a) ......................................................................................... 21

29 U.S.C. § 794d (a)(1)(A)(i)-(ii) ................................................................ 14

42 U.S.C. § 12181(7) ....................................................................................... 9

42 U.S.C. § 12181(9) ..................................................................................... 33

42 U.S.C. § 12182(a) ..................................................................................... 33

42 U.S.C. § 12182(b)(2)(A)(iv) .................................................................... 33

42 U.S.C. § 12183(a)(1) ................................................................................ 34

42 U.S.C. § 12186(b) ..................................................................................... 13

42 U.S.C. §§ 12818 *et seq.* ............................................................................. 1

47 U.S.C. § 613 ("CVAA") ........................................................................... 13

47 U.S.C. § 613(c)(2) ..................................................................................... 13

**Regulations**

28 C.F.R. § 36.104 ......................................................................................... 37

28 C.F.R. § 36.213 ......................................................................................... 31

28 C.F.R. § 36.303 ......................................................................................... 36

28 C.F.R. § 36.304 ......................................................................................... 36

28 C.F.R. § 36.307 ........................................................................................... 3

28 C.F.R. § 36.307(a) ..................................................................................... 40

28 C.F.R. § 36.406 ......................................................................................... 37

28 C.F.R. Part 36 ............................................................................................ 13

34 C.F.R. § 104.3(i) ....................................................................................... 25

34 C.F.R. § 104.23(c)(1) ................................................................................ 25

34 C.F.R. § 104.4(a) ....................................................................................... 30

34 C.F.R. § 104.4(b) ....................................................................................... 30

34 C.F.R. § 104.41 ......................................................................................... 25

34 C.F.R. § 104.42 ......................................................................................... 26

34 C.F.R. § 104.43 ............................................................................................................ 26

34 C.F.R. § 104.44(d) ....................................................................................................... 26

34 C.F.R. § 104.45 ............................................................................................................ 26

34 C.F.R. § 104.46 ............................................................................................................ 26

34 C.F.R. § 104.47 ............................................................................................................ 26

34 C.F.R. §§ 104.21 - .23 .................................................................................................. 24

34 C.F.R. §§ 104.41 - .47 .................................................................................................. 25

34 C.F.R. Part 104 ............................................................................................................ 24

36 C.F.R. § 1194.22 .......................................................................................................... 15

36 C.F.R. § 1194.22(a) ...................................................................................................... 15

47 C.F.R. § 79.4(b) ........................................................................................................... 14

**Other Authorities**

34 C.F.R. Part 104, App. A ............................................................................................... 26

Am. Ass'n of Univ. Professors, 1940 STATEMENT OF PRINCIPLES ON ACADEMIC FREEDOM AND
    TENURE, http://www.aaup.org/file/ 1940%20Statement.pdf (visited Apr. 21, 2015) ................ 7

Berkeley To Stop Adding Lecture Videos, CHRONICLE OF HIGHER EDUCATION,
    http://chronicle.com/blogs/wiredcampus/berkeley-to-stop-adding-lecture-videos-to-youtube-
    citing-budget-cuts/56587?cid=wc&utm_source=wc&utm_medium=en (May 8, 2015) ........... 7

DOJ, Advance Notice of Proposed Rulemaking, Accessibility of Web Information Services of
    State and Local Governments and Public Accommodations, 75 Fed. Reg. 43460 (July 26,
    2010) .................................................................................................................................. 9

DOJ, Section by Section Analysis of Final Rule, 56 Fed. Reg. 35544 (July 26, 1991) ............... 39

DOJ, Title III Technical Assistance Manual, § III-4.2500 .......................................................... 41

DOJ, Title III Technical Assistance Manual, § III-4.4100 .......................................................... 36

ED Office of Civil Rights, *Auxiliary Aids and Services for Postsecondary Students with
    Disabilities*, (Sept. 1988) .................................................................................................. 29

Frequently Asked Questions About the June 29, 2010, Dear Colleague Letter,
http://www2.ed.gov/about/offices/list/ocr/docs/dcl-ebook-faq-201105.pdf............................ 30

H. Rosenbaum, *Make Online Education Accessible To All*, LOS ANGELES DAILY JOURNAL (Mar.
23, 2015) ....................................................................................................................... 18

H. Rosenbaum, *MOOCs for Everyone, But the Deaf*, THE BALTIMORE SUN (Mar. 22, 2015) ....... 7

June 29, 2010 "Dear Colleague Letter,"
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.html......................... 30

Regulatory Information Service Center, Unified Agenda of Federal Regulatory and Deregulatory
Actions, 79 Fed. Reg. 76456, 76565 (Dec. 22, 2014) ............................................................. 16

W3C, Understanding SC 1.2.2, http://www.w3.org/TR/UNDERSTANDING-WCAG20/media-
equiv-captions.html............................................................................................................... 14

W3C, Web Content Accessibility Guidelines 2.0, http://www.w3.org/TR/WCAG20/................ 14

Worldwide Web Consortium, Understanding WCAG 2.0 Success Criteria 1.2.2
http://www.w3.org/TR/UNDERSTANDING-WCAG20/media-equiv-captions.html (accessed
April 23, 2015)....................................................................................................................... 8

## <u>INTRODUCTION</u>

Plaintiff National Association of the Deaf ("NAD") wants this Court to order defendant President and Fellows of Harvard College ("Harvard" or the "University") to provide "comprehensive and accurate captioning" or transcription of all existing and future online videos and audio files posted to "webpages, websites, and other Internet locations" that Harvard "controls, maintains and/or administers."

Harvard shares NAD's laudable goal of expanding online learning opportunities; in addition to providing accommodations to its enrolled students with disabilities so that they can access online content, the University provides rolling transcripts alongside all videos offered in connection with the massive open online courses ("MOOCs") that it makes available to the public free of charge.  However, NAD stretches Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") and Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12818 *et seq.* ("Title III") beyond the breaking point by insisting that these laws require federal fund recipients and public accommodations *both* to locate and then caption or remove perhaps millions of online videos and audio files posted since the Internet's creation, *and* to refrain on a going-forward basis from posting any such file that has not already been captioned. Far from making existing online content more accessible to all, this one-size-fits-all, "caption or remove" approach threatens to degrade the quantity, quality, and ready availability of scholarly and other online content.  Universities and their faculty, staff, students and alumni would be restrained from publishing new content online and required to identify and remove existing online content until it can be captioned or transcribed.  Indeed, beyond higher education, NAD's "caption or remove" approach would make millions of currently uncaptioned online videos and non-transcribed audio files presumptively unlawful and subject to lawsuits.  The chilling effect of such an approach should not be underestimated.

1

Federal anti-discrimination laws plainly do *not* mandate the "caption or remove" Hobson's choice NAD seeks to impose in this case.  Online videos and audio files — indeed, the modern Internet itself — did not exist when Congress enacted Title III and Section 504.  Hence, the statutes themselves, and the United States Departments of Justice ("DOJ") and Education ("ED") regulations implementing them, are silent as to whether or how such content might be made accessible.  And even if Title III, Section 504, and their respective regulations could be interpreted as applying in some fashion to online videos or audio files, these laws would not support NAD's excessive "caption or remove" approach, which takes no account of the nature and purpose of a file published to the Internet, the circumstances of its publication, or whether a hearing-impaired person currently desires greater access to it.  Indeed, the current Title III regulations explicitly excuse public accommodations from making the types of content changes NAD demands.

In addition, the legal landscape is currently in flux and could change dramatically when DOJ issues its long-awaited proposed rules on website accessibility later this year.  Hence, Harvard moves to stay or dismiss this action for the following reasons:

*First,* Harvard moves to stay or dismiss this action without prejudice pursuant to the doctrine of primary jurisdiction, by which federal courts decline to decide technical and legal issues that Congress entrusted to federal agencies in the first instance.  Congress granted to DOJ the responsibility to interpret Title III, and DOJ anticipates issuing proposed website and online video accessibility rules this summer.  Harvard accordingly requests that this action be stayed at least until the proposed rules are issued, so that the parties and this Court can then determine how the regulations may impact this litigation.

*Second*, and in the alternative, Harvard moves to dismiss the Complaint for failure to state a claim.  NAD's first claim, which alleges a violation of Section 504, fails because: (a) the ED's regulations enforcing Section 504 do not purport to regulate accessibility of websites and online videos or audio files; and (b) Section 504's more general anti-discrimination rules do not require Harvard or any postsecondary educational institution either to caption everything or to refrain from posting online.  NAD's second claim, which alleges a violation of Title III, fails because: (a) under the First Circuit's decision in *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc*., 37 F.3d 12 (1st Cir. 1994), websites should be assessed pursuant to Title III's facility accessibility rules, which currently do not mandate accessibility of websites or online video or audio files; (b) Title III does not require covered accommodations to caption everything or to refrain from posting online; and (c) Title III does not purport to regulate the content of goods and services public accommodations provide.  *See* 28 C.F.R. § 36.307.

## **STATEMENT OF FACTS**

### A. **NAD's "Caption Or Remove" Claims.**

NAD alleges that Harvard "creates and produces" "thousands of videos and audio tracks publicly available for free to anyone with an Internet connection, on broad-ranging topics of educational or general interest."  (Compl. ¶¶ 28 & 1.)  It also alleges that Harvard, through its faculty, students and staff and its information systems, "ma[kes] available to the general public" similar content created or produced by others through "webpages, websites and other Internet locations" that Harvard "controls," "maintains," or "administers."  (Compl. ¶¶ 28-29, 41-60.) The public accesses this content either through the University's website, www.harvard.edu, through other websites operated by Harvard users independently of central administrative review, or through third-party sites and platforms such as www.youtube.com, www.soundcloud.com, and

www.edx.org.  Collectively, the Complaint refers to all of these websites as the "Harvard Platforms" (Compl. ¶ 29), although in many cases they are owned or administered by third parties.

NAD claims that some visitors to the so-called Harvard Platforms are deaf or have hearing impairments and "require captioning to meaningfully access the audio component of online audiovisual and audio content."  (Compl. ¶ 2.)  NAD asserts that online video and audio files on these platforms are either "not captioned, or [are] inaccurately or unintelligibly captioned, making [them] inaccessible for individuals who are deaf or hard of hearing."  (Compl. ¶¶ 2, 31-39.)  Claiming that "Section 504 and / or Title III require Harvard to caption online content" for individuals who are deaf or hard of hearing (Compl. ¶ 84; *see also* Compl. ¶¶ 7-9; Prayer ¶ 1), NAD asks this Court to issue a permanent injunction requiring Harvard "to provide timely, effective communication through comprehensive and accurate captioning of the online content that it creates and/or produces, as well as the online content that it makes available on Harvard Platforms, and to ensure that such violations do not occur in the future."  (Prayer ¶ 2.)[1]

In other words, NAD demands that Harvard either caption or remove from the Internet every item posted on every one of its own websites, as well as every item created or produced by its faculty, staff, students or alumni and posted on any website even loosely affiliated with Harvard.[2]

---

[1]      Although NAD's Complaint covers both online videos and online audio files, for ease of reference Harvard primarily discusses NAD's demands as they relate to video content.  NAD's request that Harvard caption or transcribe the content of audio files does not differ in any relevant way from its request that Harvard caption video content.

[2]      The breadth of this request is made clear by NAD's virtually identical complaint against the Massachusetts Institute of Technology.  *See* Complaint in *NAD v. MIT*, No. 15-cv-30024 (D. Mass. Feb. 12, 2015), at ¶ 57, Prayer ¶ 1 (demanding that MIT caption videos posted to its TechTV site despite acknowledging that "students, faculty, staff[] and alumni" can post to it without additional permission or intervention from MIT).  Even if Section 504 and Title III might apply in some fashion to online video content, Harvard does not concede that Section 504 or Title III

### B.      Putting NAD's Complaint Into Context:  The "Countervailing Considerations" Of "Caption Or Remove."

In ruling on Harvard's motions, this Court must balance "two powerful but countervailing considerations — the need to give effect to the statutory objectives and the desire to keep [the Acts] within manageable bounds."  *Loye v. County of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010) (quoting *Alexander v. Choate*, 469 U.S. 287, 299 (1985)).  In the context of this case, that balancing must take into account that the Internet and evolving digital media technology have vastly expanded the marketplace of ideas by providing a university's faculty, staff and students — as well as the general public — the ability to communicate complex ideas cheaply, immediately, broadly, and without regard to the constraints of time and place.  *See Reno v. ACLU*, 521 U.S. 844, 853, 885 (1997); *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1129 (9th Cir. 2006) ("[W]e note the enormous impact of the Internet on . . . the marketplace of ideas.").

Harvard recognizes the basic objective addressed in NAD's Complaint.  Digital media and the Internet have not yet provided universal and immediate access to content by individuals with disabilities.  Mindful of this, Harvard, like many other universities, already has committed to providing full transcription of video content posted in the MOOCs that it offers free of charge to members of the general public who sign up for instruction.

But while accessibility laws like Section 504 and Title III may play a role in online accessibility, is it "manageable" to interpret them as currently requiring *all* recipients of federal

---

can or should be applied to a university's online operations generally or its online video content in particular.  Similarly, Harvard does not concede that either statute can or should be applied to obligate a university to monitor or control content created by a university's faculty, staff, students or alumni that is posted on third-party websites.

funds and public accommodations to caption or remove from the Internet all online content without taking into account content, context, circumstance and user need?[3]

NAD stakes out the unprecedented position that recipients of federal funds and public accommodations violate the law unless they ensure that *every* video or audio file published by anyone on an Internet platform with which these entities might be loosely affiliated is captioned on an *ex ante* basis. The implications of a court-ordered injunction endorsing this position would be staggering, not just for all institutions of higher education, but for the Internet and all of its users. Colleges and universities would be presented with the near-impossible task of tracking down, vetting centrally, and ultimately approving or rejecting for publication all of the scholarly communications now posted freely by their faculty and students, overturning longstanding principles of academic freedom according scholars full authority and discretion over when, how, and where they may communicate their ideas. *See, e.g.*, Am. Ass'n of Univ. Professors, 1940 STATEMENT OF PRINCIPLES ON ACADEMIC FREEDOM AND TENURE ("Teachers are entitled to full freedom in research and in the publication of the results . . . ."), http://www.aaup.org/file/1940%20Statement.pdf.[4]

---

[3]      Context matters when considering manageability.  Harvard contends that a university's pro bono dissemination of information to the general public should not be equated with the for-profit commercial activities of retailers and other businesses, making this case distinguishable from prior cases that have considered the obligations of business owners with respect to customers seeking to access their websites. *Cf. PGA Tour, Inc. v. Martin*, 532 U.S. 661, 692-93 (2001) (Scalia, J., dissenting); *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 268 F. Supp. 2d 1281, 1291 (D. Kan. 2003).  This distinction is underscored in cases like this one, in which the claimants did not ask for assistance in viewing a university's online content, *see Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 309 (1st Cir. 2003) (Title III "requires a person with a disability to request a reasonable and necessary modification, thereby informing the operator of a public accommodation about the disability"), and have little, if any, relationship to the targeted university. *See Fiedler v. Ocean Props., Ltd.*, 683 F. Supp. 2d 57, 71 (D. Me. 2010); *Kramer v. Midamco*, 656 F. Supp. 2d 740, 747 (N.D. Ohio 2009); *Harris v. Stonecrest Care Auto Ctr., LLC*, 472 F. Supp. 2d 1208, 1219-1220 (S.D. Cal. 2007).

[4]      To be clear, NAD is using this matter as a "test case," seeking to apply its "caption or remove" rule to *all* postsecondary educational institutions and federal grantees. *See* H. Rosenbaum, *MOOCs for Everyone, But the Deaf*, THE BALTIMORE SUN (Mar. 22, 2015) ("That is why NAD filed another lawsuit against Harvard and MIT last month on behalf of deaf and hard of hearing Americans. *We hope that all universities and colleges will comply with the*

In addition, researchers and scholars would be constrained from expressing their ideas online[5] until their universities had reviewed and outfitted their communications for accessibility. A researcher who shoots a video on a mobile phone and uploads it instantly to YouTube would cause his or her home institution to violate the law, even though it may not be technologically or practically feasible for the researcher to provide what amounts to instant captioning. *See* Worldwide Web Consortium, Understanding WCAG 2.0 Success Criteria 1.2.2 http://www.w3.org/TR/UNDERSTANDING-WCAG20/media-equiv-captions.html ("It is acknowledged that at the present time there may be difficulty in creating captions for time-sensitive material and this may result in the author being faced with the choice of delaying the information until captions are available, or publishing time-sensitive content that is inaccessible to the deaf, at least for the interval until captions are available").

Moreover, a ruling in NAD's favor would have significant implications well beyond higher education. If the requirements the plaintiffs would extract from the Rehabilitation Act and the ADA apply to Harvard, then they apply to every other online speaker receiving federal funding or providing a public accommodation — *i.e.*, every online "place of public gathering;" every online "place of exhibition or entertainment;" every online "library, gallery, or other place

---

law and provide equal access to all.") (emphasis added). As explained herein, it would onerous even for private universities like Harvard and MIT to attempt to comply with NAD's *ex ante* "caption or remove" rule; making such a demand of *all* postsecondary educational institutions, many of which have limited resources, will have even more dramatic consequences. *See* Berkeley To Stop Adding Lecture Videos, CHRONICLE OF HIGHER EDUCATION, http://chronicle.com/blogs/wiredcampus/berkeley-to-stop-adding-lecture-videos-to-youtube-citing-budget-cuts/56587?cid=wc&utm_source=wc&utm_medium=en (May 8, 2015) (U.C. Berkeley "officials announced that, because of budget cuts, the university will no longer offer new lecture recordings to the public, although the videos will still be available to students on the campus").

[5]     We are not aware of any similar requirement under the Rehabilitation Act or the ADA for scholarly communications published in hard-copy formats.

of public display or collection;" and every online "place of recreation," to select only a few

pertinent examples.  42 U.S.C. § 12181(7) (defining "public accommodation").

Under these circumstances, the "caption or remove" approach advocated by NAD is

neither manageable nor balanced.  The delay, effort, and cost associated with captioning digital

video means that any legal requirement to caption necessarily will result in less video content

online, less immediate posting of video content online, and less diverse online content generally,

as speakers choose either not to post content at all, or to post in formats other than video.  Digital

media and widespread connectivity have recently given everyone, regardless of resources, the

power not just to speak, but to publish their ideas.  But a broad "caption or remove" requirement

would raise a barrier to entry to that online marketplace of ideas, necessarily decreasing the

amount of content available to the public in general (including the deaf) and disproportionately

impacting speakers with fewer resources.

In its Advance Notice of Proposed Rulemaking, Accessibility of Web Information

Services of State and Local Governments and Public Accommodations, 75 Fed. Reg. 43460,

43463 (July 26, 2010) ("ANPRM"), DOJ recognized that a proper balance must be struck

between the rights of persons with disabilities and the enormous public value in supporting and

enabling online expression.  As we explain in greater detail below, DOJ has announced that it

will soon issue proposed rules constituting the first important step towards striking that balance.

NAD should not be permitted to bypass or derail this process by asking this Court to impose an

injunction that reaches far beyond the current boundaries of the law.

**ARGUMENT**

I.    **THIS ACTION SHOULD BE STAYED OR DISMISSED PURSUANT TO THE PRIMARY JURISDICTION DOCTRINE.**

DOJ soon will issue regulations addressing website and online video accessibility. Harvard respectfully submits that this Court should invoke the doctrine of primary jurisdiction to stay or dismiss this action and avoid making legal and policy judgments until DOJ finishes the rulemaking process.

A.    **Primary Jurisdiction Permits Courts To Stay Or Dismiss Actions Requiring Resolution Of Issues That Have Been Placed Within The Special Competence Of An Administrative Agency.**

The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63 (1956).  Primary jurisdiction requires courts to abstain from hearing cases "where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 353 (1963).  When the doctrine applies, courts have "discretion either to stay the case pending an [agency] determination or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Rymes Heating Oils, Inc. v. Springfield Terminal Ry. Co.*, 358 F.3d 82, 91 n.9 (1st Cir. 2004); *see also Nader v. Allegheny Airlines*, 426 U.S. 290, 303 (1976).

Primary jurisdiction is properly invoked either when issues arising in pending litigation will be addressed by an agency through formal rulemaking procedures, as is the case here, or when those issues can be resolved in the first instance through agency adjudicative procedures. *E.g.*, *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114-16 (9th Cir. 2008); *Kappelmann v. Delta Air Lines, Inc.*, 539 F.2d 165, 169 (D.C. Cir. 1976); *see also Brown v. Secretary of Health &*

*Human Servs.*, 46 F.3d 102, 114 (1st Cir. 1995) (citing *Kappelmann* with approval); *Figy v. Amy's Kitchen, Inc.*, 37 F. Supp. 3d 1109, 1111 (N.D. Cal. 2014) (citing cases). Indeed, federal courts stay litigation even where ongoing rulemaking will address some, but not all, of the claims at issue. *See, e.g.*, *Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1096 (E.D. Cal. 2008) ("Although [certain] causes of action will likely not be affected by the ongoing EPA rulemaking process, piecemealing claims in this litigation will waste party and judicial resources and will require duplication of efforts to resolve closely related issues on separate occasions"). Federal courts have applied the doctrine even where there is uncertainty as to when an agency will promulgate regulations and what impact they might have on the litigation. *See Heinrichs v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 72713, *4-*5 (N.D. Cal. Apr. 15, 2014) (granting a stay until the earlier of six months or the FCC's final promulgation of rules, despite the "distinct possibility" that the rules might not clarify the regulations at issue).

The United States Court of Appeals for the First Circuit favors invocation of the primary jurisdiction doctrine when: (1) an agency determination lies at the heart of the task assigned to the agency by Congress; (2) agency expertise is required to unravel intricate, technical facts; and (3) the agency determination would materially aid the court. *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 580-581 (1st Cir. 1979); *see also Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992-93 (1st Cir. 1995) (deferring to agency's decision as to whether defendant's conduct violated federal law); *Rymes*, 358 F.3d at 91 (applying factors to affirm dismissal). Each of these factors is easily satisfied here.

### B. DOJ Soon Will Issue Regulations As To Whether, How And Under What Circumstances Websites And Online Videos Should Be Made Accessible.

In this case, determination of the issue at hand plainly "lies at the heart of the task assigned to the agency by Congress." Congress empowered the Attorney General, through DOJ,

to issue regulations interpreting the relevant provisions of Title III.  42 U.S.C. § 12186(b); *see*

*generally* 28 C.F.R. Part 36.  DOJ soon will exercise that authority in ways that will materially

affect this case.

### 1.   DOJ's Proposed Regulations Likely Will Address A Number Of Difficult Policy Concerns.

DOJ acknowledges that the "Internet as it is known today did not exist when Congress

enacted the ADA and, therefore, neither the ADA nor the regulations the Department

promulgated under the ADA specifically address access to Web sites."  ANPRM, 75 Fed. Reg. at

43463.[6]  While DOJ believes that Title III applies to websites in some fashion, it recognizes that

"inconsistent court decisions, differing standards for determining Web accessibility, and repeated

calls for Department action indicate remaining uncertainty regarding the applicability of the

ADA to Web sites of entities covered by Title III."  *Id.*, 75 Fed. Reg. at 43464.  For this reason

DOJ intends to exercise its rulemaking authority to provide accessibility standards for websites

generally and online video content in particular, potentially resolving many of the issues

addressed in NAD's Complaint.  *See generally id.*, 75 Fed. Reg. 43460.

A review of the ANPRM demonstrates that DOJ has put forward nuanced questions

about website accessibility, recognizing what NAD does not — that the Internet is a varied and

dynamic environment that demands nuanced rules, not a categorical "caption or remove"

approach that would treat all online speakers, their content, and their websites the same despite

---

[6]     Congress responded to the growing presence of video programming on the Internet by enacting the Twenty-First Century Communications and Video Accessibility Act, 47 U.S.C. § 613 ("CVAA").  *See generally Greater Los Angeles Agency on Deafness Inc. v. CNN, Inc.*, 742 F.3d 414, 419-20 (9th Cir. 2014) (summarizing CVAA history).  The CVAA, and the FCC regulations promulgated to enforce it, only require captioning of full-length online videos that were published or exhibited on television with captions.  47 U.S.C. § 613(c)(2)(A); 47 C.F.R. § 79.4(b).  NAD pretends these limits away in its Complaint, which utterly ignores the CVAA.

the vast differences among them.  DOJ therefore is currently considering the following policy

issues, identified in the ANPRM:

- *What Standard?*  DOJ begins its analysis of website accessibility by asking for public comment as to whether it should adopt one of two existing website accessibility standards,[7] or whether "[g]iven the ever-changing nature of many Web sites," the Department simply should "adopt performance standards instead of any set of specific technical standards for Web site accessibility." ANPRM, 75 Fed. Reg. at 43465.

- *Control over Content?*  DOJ proposes *not* to regulate, among other things, online content: (a) "created or posted by Web site users for personal, noncommercial use . . . , even if that content is posted on the Web site of a public accommodation;" (b) posted on public accommodations' websites "by individuals not under their control as long as they provide their Web site users the ability to make their posts accessible;" and (c) "linked to [a public accommodation's] site, but that it does not operate or control." *Id.*, 75 Fed. Reg. at 43465.[8]

- *Alternatives to Captioning?*  DOJ also recognizes that the extent to which online content might be made "accessible" depends upon whether "resources and services are available to public accommodations and public entities to make their Web sites accessible."  The ANPRM notes that some "covered entities with inaccessible Web sites may comply with the ADA's requirement for access by providing an accessible alternative, such as a staffed telephone line, for individuals to access the information, goods, and services of their Web site."  DOJ asks for public comment as to whether there are "distinct or specialized features

---

[7]     The first set of standards, known as the "Section 508 Standards," was promulgated by the federal Architectural and Transportation Barriers Compliance Board (the "Access Board") and applies only to websites operated by federal government agencies, as required by section 508 of the Rehabilitation Act, 29 U.S.C. § 794d (a)(1)(A)(i)-(ii); 36 C.F.R. § 1194.22.  The second set of standards, known as the "WCAG 2.0 Standards" is a set of voluntary accessibility guidelines published by the World Wide Web Consortium, (W3C®).  *See* W3C, Web Content Accessibility Guidelines 2.0, http://www.w3.org/TR/WCAG20/; ANPRM, 75 Fed. Reg. at 43465.  The Section 508 Standards require only "equivalent alternatives" for online media presentations, 36 C.F.R. § 1194.22(a).  WCAG 2.0 Guideline 1.2.2 generally requires captioning but recognizes that "there may be difficulty in creating captions for time-sensitive material and this may result in the author being faced with the choice of delaying the information until captions are available, or publishing time-sensitive content that is inaccessible to the deaf . . . ." W3C, Understanding SC 1.2.2, http://www.w3.org/TR/UNDERSTANDING-WCAG20/media-equiv-captions.html.

[8]     The significance of these potential limitations should not be underestimated.  Colleges and universities generally do not own or control the copyright in content created by scholars and researchers and are in no position to control when, where, and how such content is posted, let alone to control content that also may be created or posted by thousands of faculty, students and staff, on their own websites or any number of third-party websites.

used on Web sites that render compliance with accessibility requirements difficult or impossible." *Id.*, 75 Fed. Reg. at 43466.[9]

- *Safe Harbor for Existing Web Pages?*  Importantly, DOJ also questions whether public accommodations and entities should be required to identify and remediate the thousands or more pre-existing web pages and online videos created before DOJ issues its final rule.[10]  DOJ recognizes that "many Web sites have hundreds (and some thousands) of pages" and therefore suggests a tiered compliance approach that parallels Title III's facilities construction and alterations rules discussed below.  DOJ suggests that any compliance regimen might distinguish between (a) newly-created or completely redesigned Web sites; (b) new pages created for existing Web sites; and (c) existing content.  *Id.*, 75 Fed. Reg. at 43466.  With respect to existing content, DOJ seeks public comment as to whether it should "adopt a safe harbor for such content so long as it is not updated or modified . . . ."  *Id.*

- *Effect upon Free Flow of Information?*  Finally, the ANPRM's section on "Costs and Benefits of Website Regulation" considers issues that lie close to the heart of any university's respect for its scholars' autonomy over their publications.  DOJ acknowledges that it must conduct a "formal cost-benefit analysis" to consider "both qualitative and quantitative measurements of the benefits and costs of the proposed rule as well as a discussion of each potentially effective and reasonably feasible alternative."  *Id.*, 75 Fed. Reg. at 43466.  Accordingly, DOJ asks for public comment on whether "the costs of a requirement to provide captioning to videos [would] cause covered entities to provide fewer videos on their Web sites," and on "other effective and reasonably feasible alternatives to making the Web sites of public accommodations accessible."  *Id.*, 75 Fed. Reg. at 43477.[11]

DOJ will issue separate proposed rules addressing web site accessibility pursuant to

Titles II and III of the ADA.  On July 9, 2014, the Department submitted its proposed Title II

---

[9]     Provision of accessible alternatives may be important in the context of higher education, primarily because other information imparted in online educational videos can be communicated effectively in ways other than captioning.  For example, in some cases, a written transcript of an online lecture could be *more* effective than line-by-line captioning.

[10]     This concern is not hypothetical.  NAD complains, for example, that Harvard failed to caption an online video depicting Senator Kennedy speaking at the Harvard Kennedy School (then known as the John F. Kennedy School of Government) — in 1988.  (Compl. ¶ 54.)

[11]     Given the sheer number of videos and other online content posted by colleges and universities over the past several years, as well as the administrative and monetary costs of compliance, inflexible regulation of online educational content by mandating "captioning" likely will undercut much of the work that higher education has done to make scholarly communications and educational content available to the general public, as opposed to a much smaller population of tuition-paying students and subscribers to academic journals.  We would expect the DOJ's rulemaking on website accessibility to take account of these competing priorities.

regulations for OMB review.  Regulatory Information Service Center, Unified Agenda of Federal Regulatory and Deregulatory Actions, 79 Fed. Reg. 76456, 76565 (Dec. 22, 2014).  DOJ's Title III notice of proposed rulemaking is scheduled to be released this summer.  *Id.*, 79 Fed. Reg. at 76570.

### 2.   DOJ's Regulations Likely Will Address Most, If Not All, Of The Issues Implicated In NAD's Complaint.

In many respects, this is a case of first impression.  Harvard is *not* an Internet retailer or a motion picture theater chain, and we are not aware of a published decision that attempts to resolve the complex policy concerns identified above with respect to private universities whose faculty, staff, students, alumni and others may publish online video content over which the universities themselves have little or no control.  Hence, this case should be stayed to permit DOJ to exercise its statutory rulemaking authority and technical expertise to address in the first instance the policy concerns outlined above.

Under the primary jurisdiction doctrine, it is proper for this Court to conclude that NAD's "claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Clark*, 523 F.3d at 1114; *see also Env. Defense Fund v. Env. Protection Agency*, 852 F.2d 1316, 1331 (D.C. Cir. 1988) ("EPA has explicitly addressed the issue of combustion residuals from industrial furnaces in its May 6, 1987 proposed burning regulations.  That rulemaking is still ongoing so the issue is not appropriate for review here"); *Kappelmann*, 539 F.2d at 173 ("The need for uniformity and a tribunal of special competence have been shown.  It also appears that rulemaking is a more appropriate means of resolving the problems presented than is adjudication. Therefore, we affirm dismissal of the requests for injunctive relief").  Establishing a uniform set of rules explaining whether and to what extent public accommodations must make websites and

14

online video content accessible under Title III clearly "lies at the heart" of the regulatory task

Congress assigned to DOJ, as required by the first primary jurisdiction factor.

C.    **DOJ Expertise Is Necessary To Unravel Intricate, Technical Facts As To Whether, How And Under What Circumstances Websites And Online Videos Should Be Made Accessible.**

The second primary jurisdiction factor — whether agency expertise is required to unravel

intricate, technical facts — is satisfied where, for example, an agency's regulatory decision is

"facilitated by an informed evaluation of the economics or technology of the regulated industry."

*Nader*, 426 U.S. at 304; *see also Blackstone Valley Elec. Co.*, 67 F.3d at 992-93 (deferring to

agency judgment because the "judicial machinery is ill-suited" to balance various technical

factors required to determine whether action violates federal law, a "determination [] much better

left to" agency decision); *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149,

1162 (9th Cir. 2010) (applying primary jurisdiction doctrine because courts are "ill equipped to

properly resolve" plaintiff's claim without "a predicate determination from the [agency].")

As explained above, DOJ has the expertise to "unravel intricate, technical facts"

governing website and online video accessibility.  DOJ is also acutely aware that it cannot

simply mandate a "caption or remove" rule like the one espoused by NAD here.[12]  Instead, DOJ

"appreciates the need to move forward deliberately.  Any regulations the Department adopts

must provide specific guidance to help ensure Web access for individuals with disabilities

---

[12]    In this case, NAD demands that Harvard caption every scrap of video content on the so-called Harvard Platforms, but NAD's public statements focus more directly on Harvard's MOOCs.  *See MOOCs for Everyone, But the Deaf*, *supra* footnote 4 ("With the popularity of MOOCs increasing every day, online content represents the next frontier for learning and lifelong education. Yet both Harvard and MIT betray their legendary leadership in quality education by denying access to approximately 48 million Americans who are deaf or hard of hearing"); H. Rosenbaum, *Make Online Education Accessible To All*, LOS ANGELES DAILY JOURNAL (Mar. 23, 2015) (same). NAD not surprisingly makes little if any mention of Harvard's MOOCs in this litigation, as video content in those courses is generally already accompanied by, and synchronized with, rolling transcripts.

without hampering innovation and technological advancement on the Web." ANPRM, 75 Fed. Reg. at 43464.

At best, a decision by this Court on the merits before DOJ acts simply would add to the "inconsistent court decisions" that prompted DOJ to issue its ANPRM in the first instance. At worst, such a decision might impose upon Harvard obligations that are more demanding than those ultimately established in the forthcoming DOJ regulations. Thus, the second primary jurisdiction factor is also easily satisfied. *See also*, *Am. Tel. & Tel. Co. v. IMR Capital Corp*., 888 F. Supp. 221, 244-45 (D. Mass. 1995) ("It is obvious that the FCC, and not this Court" has "a detailed knowledge of the economics and standard practices of the [] industry, and an understanding of the technical feasibility of various proposed alternatives"); ANPRM, 75 Fed. Reg. at 43464 ("The Department appreciates the complexity and potential impact of this initiative and therefore also seeks input from experts in the field of computer science, programming, networking, assistive technology, and other related fields whose feedback and expertise will be critical in developing a workable framework for Web site access that respects the unique characteristics of the Internet and its transformative impact on everyday life.").

### D. DOJ's Action Will Materially Aid The Court In Determining Whether, How And Under What Circumstances Websites And Online Videos Should Be Made Accessible.

The third primary jurisdiction factor, whether the agency determination would materially aid the court, also is satisfied in this case. As explained above, DOJ's anticipated regulations and this lawsuit deal with precisely the same issues and DOJ's new regulations will define the scope of any changes NAD might hope to achieve in this case. *See generally Massachusetts v. E*Trade Access, Inc*., 2005 U.S. Dist. LEXIS 22621, at *10-11 (D. Mass. Feb. 22, 2005) ("[T]he DOJ's regulations therefore establish the limits of ADA liability."); *United States v. Nat'l Amusements, Inc*., 180 F. Supp. 2d 251, 262 (D. Mass. 2001) (same). As the issues highlighted

16

in the ANPRM make clear, DOJ is considering in a nuanced way the many potential consequences of imposing various kinds of website accessibility regulations.  It plainly would be beneficial to this Court to have the benefit of the agency's thinking, informed by public participation in the rule-making process, on these very complex issues before evaluating the novel claims brought by NAD.

NAD cannot claim any prejudice resulting from a stay or dismissal without prejudice pending the final DOJ rulemaking.  *See Rymes*, 358 F.3d at n.9.  As explained above, DOJ has scheduled its proposed rules for release in the summer of this year.  NAD served Harvard with its initial demand letter in December 2013 and waited until February 2015 to file its Complaint. Allowing the rulemaking process to run its course to completion, especially given the apparent imminence of the proposed rules, cannot be seen as prejudicial in these circumstances.

In short, it makes no sense for this Court to expend limited judicial resources deciding issues that ultimately will be addressed by the DOJ's website and online video accessibility rules. These anticipated regulations "lie[] at the heart of the matters at issue here;" the DOJ's "expertise will throw light on some technical aspects of the case;" and its "determination will be of assistance to the court."  *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 2011 U.S. Dist. LEXIS 130443, at *2 (D. Mass. Nov. 10, 2011) (internal quotation and citation omitted).  This action accordingly should be stayed or dismissed without prejudice pursuant to the primary jurisdiction doctrine.

* * * * *

However, should this Court decline to stay or dismiss these actions pursuant to the primary jurisdiction doctrine, Harvard alternatively moves to dismiss NAD's Complaint for the reasons further outlined below.

17

## II.   NAD'S SECTION 504 CLAIM SHOULD BE DISMISSED.

NAD first alleges a violation of Section 504 of the Rehabilitation Act of 1973, which

provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of

her or his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance

. . . ." 29 U.S.C. § 794(a).

The Supreme Court has held that "neither the language, purpose, nor history of § 504

reveals an intent to impose an affirmative-action obligation on all recipients of federal funds."

*Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 411 (1979).  In addition, the Supreme Court

has "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie

cases under § 504 . . . ."  *Choate*, 469 U.S. at 299.  Rather, "[a]ny interpretation of § 504 must . .

. be responsive to two powerful but countervailing considerations — the need to give effect to

the statutory objectives and the desire to keep § 504 within manageable bounds."  *Id.*  The Court

therefore has interpreted Section 504 to require only "that an otherwise qualified handicapped

individual must be provided with meaningful access to the benefit that the grantee offers."  *Id.* at

301; *see also Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 23-25 (1st Cir. 1991) (en banc)

("*Wynne I*") (explaining *Davis* and *Choate*).

"Despite courts' efforts to interpret Section 504 and determine what it requires of federal

grantees, the statute is nonetheless still ambiguous and lacking in specifics."  *Three Rivers Ctr.*

*for Indep. Living, Inc. v. Hous. Auth.*, 382 F.3d 412, 427 (3d Cir. 2004) (citations and internal

quotation marks omitted).  Thus, federal courts recognize "that the relevant federal agency and

not the court has the chief responsibility to determine what Section 504 requires of recipients of

federal funds in accommodating the needs of disabled persons."  *Disabled in Action of Pa. v.*

*Sykes*, 833 F.2d 1113, 1117 (3d Cir. 1987); *see also Greater Los Angeles Council on Deafness,*

*Inc. v. Community Television of S. Cal.*, 719 F.2d 1017, 1023 (9th Cir. 1983) (dismissing claim

that public television stations should have gone beyond ED's requirement to caption only a

portion of their programs, because stations "are not compelled by section 504 to take further

affirmative action to compensate for the inability of the hearing impaired viewers to receive the

audio portion of the broadcast").

The First Circuit endorsed this proposition in *Rhode Island Handicapped Action*

*Committee v. Rhode Island Public Transit Authority*, 718 F.2d 490 (1st Cir. 1983).  In that case,

a civil rights group sued the Authority for purchasing buses without wheelchair lifts.  The

Authority claimed that it had complied with existing Department of Transportation ("DOT")

regulations, which required a certain amount of annual spending for the transportation of persons

in wheelchairs and provided a safe harbor once that threshold was reached.  *Id.* at 494.  The

district court rejected this defense, explaining "that its interpretation of § 504 is broader than that

contained in the . . . regulation, and that it was obliged to follow the statute before the regulation

on qualifying programs."  *Id.* (internal quotation marks omitted).

The First Circuit reversed, holding that the district court's order crossed the line between

permitted "meaningful access" and prohibited "affirmative action" under the Supreme Court's

decision in *Davis*.  While acknowledging that Section 504's "scope and effect have been an

enigma since section 504 was enacted," the court nonetheless rejected the district court's *ad hoc*

approach because it would leave those responsible for Section 504 compliance "without any way

to know in advance which of their plans would later pass judicial muster and which would be

struck down, often at great cost in delay and wasted effort."  *Id.* at 494, 498.  Hence, the First

Circuit concluded, "primary guidance must come from the regulations promulgated by the

federal agency responsible for overseeing the federal funds being used by the state or local agency." *Id.* at 499.

In this case, ED has issued two specific regulations interpreting how Section 504's general rule against discrimination applies to educational institutions that receive federal funds. *See generally* 34 C.F.R. Part 104.  Neither of these regulations imposes anything close to the boundless rule NAD advocates.

A.      **NAD Cannot State A Claim Based On Section 504's Facilities Access Rules.**

Subpart C of ED's regulations, 34 C.F.R. §§ 104.21 - .23, governs facilities accessibility and distinguishes between existing facilities and new construction.  Sections 104.23(a) and (b) require that facilities designed and constructed or altered after the regulation's effective date must be "readily accessible and usable by" those with disabilities.  Section 104.22(a) requires that a recipient of federal funds "shall operate its program or activity so that when each part is viewed in its entirety, it is readily accessible" to the disabled, but Section 104.22(a) "does not require a recipient to make each of its existing facilities or every part of a facility accessible to and usable by" disabled individuals.  ED's regulations provide that facilities are deemed readily accessible if they comply "with sections 3-8 of the Uniform Federal Accessibility Standards (UFAS) (Appendix A to 41 C.F.R. subpart 101-19.6)." *Id.* § 104.23(c)(1).

These regulations foreclose any complaint about Harvard's websites or online video facilities for two related reasons.  First, ED regulations apply only to "all or any portion of buildings, structures, equipment, roads, walks, parking lots, or other real or personal property" and do not even impliedly refer to videos created and produced for viewing on the Internet. *Id.* § 104.3(i).  Second, the UFAS do not even mention, let alone regulate the accessibility of, Internet websites and thus cannot be read to require recipients of federal funds to caption videos they create and produce for viewing on the Internet.  The UFAS, which define the extent of

Harvard's facilities accessibility obligation, simply have no application here.  *See Nat'l Amusements*, 180 F. Supp. 2d at 258; *E*Trade Access*, 2005 U.S. Dist. LEXIS 22621 at *10.

    **B.**     **NAD Cannot State A Claim Based On Section 504's Postsecondary Education Rules.**

    Subpart E of ED's regulations, 34 C.F.R. §§ 104.41 - .47, prescribes what colleges and universities must do to make their educational programs or activities accessible to individuals with disabilities.  *Id.* § 104.41.  However, none of these provisions purports to regulate the accessibility of Internet websites generally, let alone the accessibility of online videos.  Instead, Subpart E mandates that postsecondary educational institutions receiving federal funding must refrain from discriminating on the basis of disability in the provision of: admissions and recruitment services, *id.* § 104.42; academic, research, and occupational training and other educational services, *id.* § 104.43; housing, § 104.45; financial and employment assistance to students, *id.* § 104.46; and other "nonacademic services," including physical education and athletics, counseling, and social organizations, *id.* § 104.47.

    While 34 C.F.R. § 104.44(d) mandates the provision of "educational auxiliary aids" in certain circumstances, this clause cannot salvage NAD's claims.  First, such aids are required only to ensure that no disabled "*student* is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills," *id.* § 104.44(d)(1) (emphasis added), a provision that makes no mention of the public, the Internet, online videos or captioning.  NAD does not — and would be hard-pressed to — allege that Harvard denies educational auxiliary aids to its students.

    Second, ED's educational auxiliary aids standard has never imposed the "caption everything, regardless of its source, date, or desirability" requirement that NAD asserts.  Instead,

ED recognizes that postsecondary educational institutions necessarily have the inherent *flexibility* to determine which auxiliary aid should be supplied and to supply it only upon request:

> In those circumstances where the recipient institution must provide the educational auxiliary aid, the institution has flexibility in choosing the methods by which the aids will be supplied.  For example, some universities have used students to work with the institution's handicapped students.  Other institutions have used existing private agencies that tape texts for handicapped students free of charge in order to reduce the number of readers needed for visually impaired students.

> As long as no handicapped person is excluded from a program because of the lack of an appropriate aid, the recipient need not have all such aids on hand at all times.  Thus, readers need not be available in the recipient's library at all times so long as the schedule of times when a reader is available is established, is adhered to, and is sufficient.  *Of course, recipients are not required to maintain a complete braille library*.

34 C.F.R. Part 104, App. A (emphasis added).

This contextual, flexible approach for postsecondary education is consistent with existing First Circuit law.  In *Wynne I*, the First Circuit acknowledged the tension between the right of individuals with disabilities to obtain various forms of "reasonable accommodations" and the "great respect" courts rightly accord the professional judgment of institutions of higher education. Quoting the Supreme Court's decision in *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985), the court recognized that, in the absence of statutory limitations, courts should not override a college's professional academic decisions unless they amount to "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *Wynne I,* 932 F.2d at 25.

The First Circuit explicitly recognized that "the same principle of respect for academic decision making applies" in Section 504 cases, provided academic institutions accept their "real obligation . . . to seek suitable means of reasonably accommodating a handicapped person."  *Id.* at 25-26.  In other words, if the "relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally

22

justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration," then a court could conclude "as a matter of law that the institution had met its duty of seeking reasonable accommodation." *Id.* at 26.

In later proceedings, the First Circuit reaffirmed that "[r]easonableness is not a constant. To the contrary, what is reasonable in a particular situation may not be reasonable in a different situation — even if the situational differences are relatively slight." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992) ("*Wynne II*"). The Court explained that "[i]n the Section 504 milieu, an academic institution can be expected to respond only to what it knows (or is chargeable with knowing). . . . A relevant aspect of this inquiry is whether the student ever put the medical school on notice of his handicap by making a sufficiently direct and specific request for special accommodations." *Id.* (internal citations and quotation marks omitted).

Under this standard, NAD cannot state a claim for violation of Section 504 by alleging that Harvard failed to caption *all* online video content without regard to its source, purpose, context, location or level of demand. ED's regulations are designed to ensure effective communication between postsecondary educational institutions and the students they serve. But because the obligation to effectively communicate necessarily is context-specific, the method by which it is achieved "will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Godbey v. Iredell Mem'l Hosp., Inc.*, 2013 U.S. Dist. LEXIS 117129, *20 (W.D.N.C. Aug. 19, 2013) (citations and internal quotation marks omitted). While captioning may provide an effective form of communication for some, there is no *per se* rule requiring its use for all individuals with hearing impairments. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 208 (1982) (sign-language interpreters are not required when other

accommodations are sufficient).  That is especially the case when other forms of communication may be *more* effective than real-time captioning, *see supra* footnote 9, and where no one actually has sought access to the materials in question.

If adopted, NAD's demand, that *all* online video content be captioned in advance, is no different from demanding that Harvard maintain the online equivalent of "a complete braille library," which ED unequivocally says is *not* required.  34 C.F.R. Part 104, App. A. NAD's categorical theory of liability impermissibly deprives Harvard of the flexibility that Section 504 and ED regulations grant to postsecondary educational institutions and thus should be rejected as a matter of law.  *See, e.g.*, *Loye*, 625 F.3d at 499 (rejecting plaintiffs' claim that "a [sign language] interpreter is mandated for every meeting," the court of appeals explained that "there is a difference between providing information — a service — and the series of meetings at which information is provided.  Plaintiffs confuse the two when they argue that Title II required that an ASL interpreter must be present at every meeting.  Therefore, the fact disputes Plaintiffs emphasize were not material to the grant of summary judgment because the record establishes they had meaningful access to the services provided all evacuees"); *see also* ED Office of Civil Rights, *Auxiliary Aids and Services for Postsecondary Students with Disabilities* (Sept. 1988), http://www2.ed.gov/about/offices/list/ocr/docs/auxaids.html ("[T]he type of assistance needed in a classroom by a student who is hearing-impaired may vary," and "[c]olleges are not required to provide the most sophisticated auxiliary aids available; however, the aids provided must effectively meet the needs of a student with a disability.  An institution has flexibility in

choosing the specific aid or service it provides to the student, as long as the aid or service selected is effective.").[13]

C.   **The Dear Colleague Letter And Its FAQs Do Not Mandate A "Caption Or Remove" Approach To Effective Communication.**

NAD's Complaint does not respond to these settled tenets of Section 504 jurisprudence. Instead, NAD grounds its "caption or remove" approach upon the general prohibitions against discrimination in Part A of the ED's regulations, *see* 34 C.F.R. §§ 104.4(a) & 104.4(b), as applied by a June 29, 2010 "Dear Colleague Letter," https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.html ("DCL") and a May 26, 2011 Frequently Asked Questions About the June 29, 2010, Dear Colleague Letter, http://www2.ed.gov/about/offices/list/ocr/docs/dcl-ebook-faq-201105.pdf  ("FAQ").  These materials do not support NAD's unqualified theory of liability.[14]

First, ED's general regulations do not speak to website accessibility or captioning online video content.  As noted above, DOJ is proposing to issue website accessibility regulations to address what it characterizes as "remaining uncertainty" regarding applicability of the ADA to websites, ANPRM, 75 Fed. Reg. at 43464.

At best, NAD's claims are governed by the specific ED regulations relating to educational auxiliary aids; as explained above, NAD cannot rely on ED's general regulations to override or avoid the flexibility the more specific regulations grant to postsecondary institutions.

---

[13]      This flexibility makes sense given the deference that courts and regulators give to an educational institution's professional judgment.  After all, requiring auxiliary aids at all times and for all communications could interfere with other students' learning activities, disrupt a professor's ability to rapidly disseminate groundbreaking advances, infringe upon academic freedom, cost far more than any likely benefit, or have other harmful effects that universities are best positioned to assess in the first instance.

[14]      The University accepts at face value the contents of the DCL and FAQs solely for purposes of this motion to dismiss.  We do not concede that the DCL or FAQs are entitled to deference should this matter proceed past the pleading stage.  *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

*E.g.*, *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1013 (9th Cir. 2009) ("If Congress intended that transit agencies could rely on DOT regulations in the design of their facilities, it defies logic that the transit agencies' protection could be taken away merely by citing a section of the ADA dealing with operations or one establishing a general non-discrimination rule.  That would make Congress' enactment of section 12150 without any effect, because it would offer no protection at all to transit agencies which followed the rules"); *see also* 28 C.F.R. § 36.213 (Title III regulation recognizing that the specific prohibitions "including the limitations on those provisions, control over the general provisions in circumstances where both specific and general provisions apply").

Second, NAD's reliance on the June 29, 2010 DCL is misplaced because that letter addressed the use of "electronic book readers that are not accessible to students who are blind or have low vision."  DCL at 1.  The advice ED and DOJ may have provided with respect to inaccessible *devices* provides no guidance regarding the much more difficult policy questions DOJ is considering in promulgating accessibility regulations for websites and online video content, as described above.  This distinction is material for a number of reasons, chief among which is that the DCL regulates technology, whereas NAD's requested injunction would regulate content — *i.e.,* the expression rendered by the technology.

Third, NAD's reliance upon the May 26, 2011 FAQs strays even farther afield.  The FAQ indicates for the first time that "the principles in the DCL can be applied to online programs."  FAQ 7.  However, FAQ 12 explicitly eschews a "caption or remove" approach by providing that schools may choose to provide "traditional alternative media as an accommodation to provide equal access to educational opportunities and benefits provided to all students . . . ."

Indeed, were these materials read to impose a categorical "caption or remove" rule *sub silentio*, they would conflict with the agencies' prior specific statements about auxiliary aids and with the judicially recognized need for an individual accommodation process that is sensitive to universities' expertise. *See Wynne II*, 976 F.2d at 795; *Jimenez v. Almodovar*, 650 F.2d 363, 368 (1st Cir. 1981) (noting that court decisions are "consistent with" this "widely adopted" statement of academic freedom).

Neither Section 504 itself nor ED's rules interpreting it mandate website accessibility generally, let alone wholesale captioning of all online videos. This, of course, does not mean that disabled persons who unsuccessfully seek accommodation have no recourse. "[T]hose who find the [UFAS] guidelines or [ED] regulations unreasonable may challenge them under the Administrative Procedure Act ("APA") . . . ." *George*, 577 F.3d at 1013. But NAD "should not be permitted to use the courts to enact regulations they failed to convince the . . . Board or the [ED] to implement and did not thereafter challenge under the APA." *Id.* (internal quotation marks omitted).

## III.   NAD'S ADA TITLE III CLAIM SHOULD BE DISMISSED.

NAD also claims a violation of Title III, which generally provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a) (2012).

The extent of a public accommodation's obligations under Title III's general rule are defined by two sets of subordinate rules:  Title III's facilities construction and alterations rules, contained primarily in sections 302(b)(2) and 303(a) and (b), and its general and specific

prohibitions against discrimination, as contained in sections 302(b)(1) and (b)(2).  Neither

provision can be applied here without further regulatory guidance from DOJ.

     **A.**     **NAD's Title III Claim Must Be Dismissed Because DOJ Has Not Yet Promulgated Standards Addressing Website And Online Video Accessibility.**

          **1.**     **Title III Contains Specific Rules Governing Facility Construction, Alteration And Barrier Removal; In The First Circuit, Websites Are "Facilities" And Are Governed By These Rules.**

In enacting Title III, Congress adopted a tiered approach for making public

accommodations and commercial facilities accessible.  Congress relieved private entities that

own, operate, lease or control places of public accommodation from the economic burden of

immediately and extensively retrofitting existing facilities by mandating removal of barriers in

such facilities only when "readily achievable," *id.* § 12182(b)(2)(A)(iv), meaning  "easily

accomplishable and able to be carried out without much difficulty or expense," *id.* § 12181(9).

Title III imposes more demanding standards for newly constructed and altered facilities, as costs

incurred in providing accessibility can be included in the building's overall cost of construction;

these must be "readily accessible and usable by individuals with disabilities." *Id.* §§ 12183(a)(1)

& (2).  *See generally*, *Colo. Cross-Disability Coalition v. Too, (Delaware), Inc*., 344 F. Supp. 2d

707, 709 (D. Colo. 2004) (describing standards).

In most Circuits, Title III's facility construction and alterations rules do not apply to

websites or online content because "[t]he plain meaning of Title III is that a public

accommodation is a place . . . ."  *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612 (3d Cir.

1998); *see also Weyer v. Twentieth Century Fox Film Corp*., 198 F.3d 1104, 1114 (9th Cir. 2000);

*Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1010-11 (6th Cir. 1998) (en banc); *Access

Now, Inc. v. Southwest Airlines, Co.*, 227 F. Supp. 2d 1312, 1320 n.10 (S.D. Fla. 2002).

However, the First Circuit came to a contrary conclusion, holding in *Carparts Distribution Center v. Auto Wholesaler's Ass'n of New England*, 37 F.3d 12, that Title III's "plain meaning [does] not require 'public accommodations' to have physical structures for persons to enter." *Id.* at 19; *see also Netflix, Inc.*, 869 F. Supp. 2d at 200 (applying *Carparts* to hold that online streaming video services qualify as places of public accommodation). With respect, Harvard believes that *Carparts* was wrongly decided and that Congress plainly intended to limit the term "public accommodations" to physical places, and did not intend to encompass websites. *See e.g.*, *Cullen v. Netflix, Inc.*, 2015 U.S. App. LEXIS 5257, at *2 (9th Cir. Apr. 1, 2015) (unpublished) ("Because Netflix's services are not connected to any 'actual, physical place[],' Netflix is not subject to the ADA"). However, reserving the right to challenge *Carparts* on appeal if necessary, the University assumes *arguendo* that Title III applies to its websites.

NAD alleges that Title III requires Harvard to ensure that captioning has been integrated within the structure of online videos posted on Harvard Platforms. (*E.g.*, Compl. ¶ 8.) In other words, NAD does not claim that Harvard failed to include a captioning feature, such as YouTube's "CC" toggle or some other piece of equipment or device that gives users the ability to view captions already embedded in online videos. Instead, NAD's claim is that Harvard should have, but failed, to integrate captioning within the online videos itself.

Thus framed, the question before this Court is whether such a failure constitutes a violation of Title III's facilities construction, alteration and barrier removal rules, assuming that Internet websites qualify as places of public accommodation under *Carparts*.[15]

---

[15]    We acknowledge that DOJ and some courts evaluate website accessibility under Title III's auxiliary aids standard, which is designed to ensure "effective communication." However, this approach cannot be squared with the holdings of several district courts that websites and online services qualify as "facilities" and "places" under *Carparts* even though they do not exist in physical spaces. *See Nat'l Fed'n of the Blind v. Scribd, Inc.*, 2015 U.S. Dist. Lexis 34213 (D. Vt. March 19, 2015) (online library); *Netflix, Inc.*, 869 F. Supp. 2d at 200 (online streaming

2.      **NAD Cannot Establish That Online Videos On Harvard Platforms Violate Title III's Construction, Alteration And Barrier Removal Rules.**

NAD's website design claim fails to state a claim for relief.  Courts evaluate whether a newly constructed or altered facility is "readily accessible" by determining whether the facility and its elements comply with the ADA Standards for Accessible Design, more commonly known as the "ADAAGs," adopted by DOJ in its Title III regulations.  *Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co*., 765 F.3d 1205, 1220 (10th Cir. 2014); *see generally* 28 C.F.R. §§ 36.104, 36.406; *Miller v. Cal. Speedway Corp*., 536 F.3d 1020, 1024-25 (9th Cir. 2008) (describing the ADA's regulatory framework).  Courts similarly determine whether an existing facility contains a "barrier" that is subject to the "readily achievable" standard by evaluating whether its elements comply with the ADAAGs.  *Oliver v. Ralph's Grocery Co*., 654 F.3d 903, 905 (9th Cir. 2011); *Snyder v. Lady Slings the Booze, LLC*, 2014 U.S. Dist. LEXIS 176992, *7-*8 (W.D. Ky. Dec. 23, 2014) ("Though not defined in the ADA, the term 'architectural barrier' is interpreted to mean any element of an existing facility that does not meet or exceed the

---

service).  If it is true, as these authorities posit, that online services qualify as "facilities" or "places" of public accommodation, then NAD is not free to pick and choose as to which of Title III's rules apply.

This approach is consistent with the distinction DOJ draws between "communications barriers of a structural nature" that are subject to Title III's barrier removal rules, and communication devices designed to ensure "effective communication, which are governed by Title III's auxiliary aids standard, 42 U.S.C. § 12182(b)(2)(A)(iii). *See* DOJ, Title III Technical Assistance Manual, § III-4.4100 (noting that "[c]ommunication barriers that are 'structural in nature' are barriers that are an integral part of the physical structure of a facility. . . . . [¶] Communications devices, such as TDD's, telephone handset amplifiers, assistive listening devices, and digital check-out displays, are not an integral part of the physical structure of the building and, therefore, are considered auxiliary aids under the Department's title III regulation.  The failure to provide auxiliary aids is not a communication barrier that is structural in nature"); *see also Section by Section Analysis of Final Rule*, 56 Fed. Reg. at 35568 ("The statute, however, as read by the Department, limits the application of the phrase "communications barriers that are structural in nature" to those barriers that are an integral part of the physical structure of a facility. Given that § 36.304's proper focus is on the removal of physical barriers, the Department believes that the obligation to provide communications equipment and devices such as TDD's, telephone handset amplifiers, assistive listening devices, and digital check-out displays is more appropriately determined by the requirements for auxiliary aids and services under § 36.303.").

30

requirements of the ADA Accessibility Guidelines for Buildings and Facilities ('ADAAG')."); *see id.* (collecting cases).

Courts insist upon confining the scope of a covered entity's obligations to ADAAG compliance because, "were it otherwise, an entity's decision to follow the standards and build an 'accessible' facility would have little meaning." *Abercrombie & Fitch Co*., 765 F.3d at 1220; *see also Kohler v. Flava Enters*., 779 F.3d 1016, 1018 (9th Cir. 2015) ("To clarify what constitutes 'equal access' in specific circumstances, the Department of Justice has promulgated the Accessibility Guidelines ('ADAAG') that specify precise structural requirements").  And where, as here, "there is no ADAAG standard governing what plaintiffs seek, then plaintiffs cannot sustain a claim of discrimination . . . based on the facility." *Thomas v. Nw. Airlines Corp.*, 2011 U.S. Dist. LEXIS 91149, *4 ( E.D. Mich. Aug. 16, 2011); *see also E\*Trade*, 2005 U.S. Dist. LEXIS 22621, at *10-11 ("The statutory language and structure of the ADA indicate that Congress intended that DOJ's regulations and the ADAAG, when passed, would set forth the standards sufficient to satisfy the ADA obligations . . . Accordingly, the remedy of voice-guidance technology, which is not mandated or required by the current DOJ regulations may not be imposed on the Defendants in this case."); *Nat'l Amusements, Inc*., 180 F. Supp. 2d at 261 (noting that federal courts "are ill-equipped to evaluate such claims and to make what amount to engineering, architectural, and policy determinations as to whether a particular design feature is feasible and desirable," and that "[i]t also would be difficult for anyone to design a new arena or other structure if the design requirements are subject to being changed retroactively") (citations omitted).

These precedents compel the dismissal of NAD's Title III claims.  The existing ADAAGs contain *no* provisions governing accessibility of websites or online video content.  In addition,

31

DOJ's current regulations (at least pending the ANPRM) are equally silent as to whether and to what extent websites and online video content must be made accessible. NAD's demands impermissibly extend design liability considerably beyond what Title III and the ADAAGs require.

**B.      Title III Does Not Require Harvard To Create Or Provide Captioned Videos.**

NAD's Complaint conveniently ignores Title III's facility design, construction and alteration standards. NAD instead alleges that, by failing to include captioning in online videos displayed on the Harvard Platforms, the University violates a number of Title III's general and specific prohibitions against discrimination. *See* 42 U.S.C. §§ 12182(b)(1) (general prohibitions) & 12182(b)(2) (specific prohibitions). (Compl. ¶ 99.) Assuming, *arguendo*, that facility accessibility could be evaluated pursuant to these more general rules (though under *Carparts* it cannot), NAD's claims still would fail for two reasons.

First, NAD's categorical theory of liability impermissibly deprives Harvard of the flexibility that Title III and DOJ regulations grant to public accommodations. Like Section 504, Title III grants public accommodations flexibility to "choose among various alternatives as long as the result is effective communication," a determination that "depend[s] on the facts of the particular case." DOJ, Section by Section Analysis of Final Rule, 56 Fed. Reg. 35544, 35566 & 35557 (July 26, 1991); *see also Hannaford Bros. Co.*, 333 F.3d at 310 ("[E]ven though an individualized inquiry will consume more resources and involve less logistical ease, such an inquiry is precisely what the ADA requires"); *Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998) (same); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Nothing in the ADA itself or its implementing regulations dictates that a disabled individual *must* be provided with the type of auxiliary aid or service he requests unless it would alter the

service provided or create an unreasonable burden or expense") (emphasis in original); *Godbey,* 2013 U.S. Dist. LEXIS 117129 at *20-21 (same).

Second, Title III does not require Harvard to create accessible content or to provide accessible goods and services. *See Ford*, 145 F.3d at 613 ("The purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation, not to alter the nature or mix of goods that the public accommodation has typically provided") (citations omitted). This basic tenet of Title III jurisprudence first was articulated in section 36.307(a) of the Department's 1991 Title III regulations, which provides that "[t]his part does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a). The regulation goes on to explain that "[e]xamples of accessible or special goods include items such as Brailled versions of books, books on audio cassettes, closed-captioned video tapes, special sizes or lines of clothing, and special foods to meet particular dietary needs." *Id.* § 36.307(d).

The "accessible or special goods" exception has been applied in myriad settings and was most recently invoked to reject a plaintiff's claim that Title III requires public accommodations to sell captioned DVDs. *See Jancik v. Redbox Automated Retail, LLC*, 2014 U.S. Dist. LEXIS 67223, *13-14 (C.D. Cal. 2014) ("Here, closed-captioned DVDs provide individuals with disabilities with access to video content, within the ordinary meaning of 'access.' The fact that it is now easier to make a product 'accessible' does not alter the plain meaning of the regulation. Mr. Jancik's argument is more properly directed to the agency charged with promulgating the regulations, the U.S. Department of Justice. Accordingly, the Court plainly construes the existing regulation and finds that closed-captioned DVDs are 'accessible' goods within the

33

meaning of § 36.307.").  *Jancik*'s holding comes as no surprise, as DOJ consistently has opined that public accommodations are *not* obligated to caption videos.  *See* DOJ, Section by Section Analysis of Final Rule, 56 Fed. Reg. at 3557 ("[A] video store must make its facilities and rental operations accessible, but is not required to stock closed-captioned video tapes . . . ."); DOJ, Title III Technical Assistance Manual, § III-4.2500 (noting that "[t]he ADA does not require that manufacturers provide warranties or operating manuals that are packed with the product in accessible formats").

NAD alleges that Harvard creates or produces online videos that either are "not captioned, or [are] inaccurately or unintelligibly captioned, making [them] inaccessible for individuals who are deaf or hard of hearing."  (Compl. ¶¶ 2, 31-3.)  However, NAD's proposed remedy — requiring the University to caption every video it "creates and / or produces" (Prayer ¶ 2) — runs headlong into 28 C.F.R. § 36.307's accessible goods exception and cannot be sustained.

Harvard shares the goal of broadening access in the online sphere; indeed the University provides rolling transcripts of video content in its MOOCs.  But this case is about what the law requires, and Section 36.307 makes clear that Title III's reach is not unlimited.  Title III simply does not require public accommodations to create or publish accessible online videos.  *See McNeil v. Time Ins. Co.*, 205 F.3d 179, 188 (5th Cir. 2000) ("[W]e read Title III to prohibit an owner, etc., of a place of public accommodation from denying the disabled access to the good or service and from interfering with the disableds' full and equal enjoyment of the goods and services offered.  But the owner, etc., need not modify or alter the goods and services that it offers in order to avoid violating Title III"); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559-60 (7th Cir. 1999) (noting that under Title III "it is apparent that a store is not required to alter its inventory in order to stock goods such as Braille books that are especially designed for disabled

people," and that "[t]he common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated.  A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons.  Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards"); *Karczewski v. K Motors, Inc.*, 2015 U.S. Dist. LEXIS 45226, *7 (S.D. Cal. March 21, 2015) ("In order to accommodate Plaintiff's desire to test drive a vehicle in its inventory, the dealership would have to alter the nature of the vehicles that it sells. Under the plain terms of Title III's implementing regulations, a car dealership does not have to alter its inventory to include vehicles with special modifications for disabled drivers").  NAD's Title III claims should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Harvard's motion to stay or dismiss should be granted.

Dated:  May 11, 2015.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

By its counsel,

/s/ Robert A. Naeve
Robert A. Naeve, *pro hac vice* (CSB# 106095)
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA  92612
949-553-7507
rnaeve@jonesday.com

Christopher M. Morrison (BBO#651335)
Emily E. Gianetta (BBO#687585)
JONES DAY
100 High Street
Boston, MA  02110
617-449-6895
617-449-6938
cmorrison@jonesday.com
egianetta@jonesday.com

Jeffrey Johnson, *pro hac vice pending* (DCB#1015307)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC  20001
202-879-7684
jeffreyjohnson@jonesday.com

**CERTIFICATE OF SERVICE**

       I, Robert A. Naeve, hereby certify that the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as nonregistered participants by first class mail on May 11, 2015.

Dated: May 11, 2015.                  /s/ Robert A. Naeve_____
                                       Robert A. Naeve