UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NATIONAL ASSOCIATION OF THE DEAF,   )
et al.,                                                    )
                                                            )
        Plaintiffs,                                       )
                                                            )
               v.                                         )          Case No. 3:15-cv-30023-KAR
                                                            )
HARVARD UNIVERSITY, and the            )
PRESIDENT AND FELLOWS OF            )
HARVARD COLLEGE,                          )
                                                            )
        Defendants.                                     )

MEMORANDUM AND ORDER
REGARDING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
(Dkt. No. 140)

ROBERTSON, U.S.M.J.

        The National Association of the Deaf ("NAD"), on behalf of its members, and three

individually named plaintiffs, C. Wayne Dore, Christy Smith, and Lee Nettles (collectively,

"Plaintiffs"),[1] brought this putative class action under Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. § 794 ("Section 504"), and Title III of the Americans with Disabilities Act of

1990, 29 U.S.C. §§ 12181-12189 ("Title III" or "ADA"), against Harvard University and the

President and Fellows of Harvard College ("Harvard").[2]  Plaintiffs seek declaratory and

injunctive relief requiring Harvard to provide timely, accurate captioning of the audio and

audiovisual content that Harvard makes available online to the general public for free.  On

---

[1] On March 16, 2016, the court was notified of the death of Diane Nettles, one of the original
individual plaintiffs (Dkt. No. 57).
[2] Plaintiffs' complaint names as defendants Harvard University and its governing board, the
President and Fellows of Harvard College (Compl. at p. 1, ¶ 1).  In its answer, the defendant
states that the legal name of Harvard University is "President and Fellows of Harvard College"
(Answer at p. 5, ¶ 25).

November 3, 2016, the Honorable Mark G. Mastroianni adopted a report and recommendation denying Harvard's Motion to Stay or Dismiss (Dkt. No. 23), which argued for dismissal on the basis of the doctrine of primary jurisdiction or, alternatively, that Plaintiffs' complaint failed to state a claim (Dkt. No. 77).  The parties have since consented to this court's jurisdiction for all purposes (Dkt. No. 125).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  On June 29, 2018, Harvard filed its Motion for Judgement on the Pleadings ("Defendant's Motion") (Dkt. No. 140), which Plaintiffs oppose.  For the reasons set forth below, the court will deny Harvard's Motion in part and grant it in part.

I.    BACKGROUND

 Because "any new facts contained in the answer, to which no responsive pleading by the plaintiff is required, are deemed denied," the principle relevant facts remain those asserted in the complaint.  *Kando v. Rhode Island State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018).

Harvard, an undergraduate and postgraduate school and a recipient of federal funding, controls, maintains, and administers webpages, websites, and other internet locations on which it makes available to the general public, free of charge, a vast array of content, consisting of courses and other educational and general interest materials (Compl. at pp. 1, 7, 8, ¶¶ 1, 24, 25-28).  Included within the online content are thousands of audio and audiovisual files, which communicate information aurally (Compl. at p. 1, ¶ 1).[3]  Harvard creates and produces some, but not all, of the content (Compl. at p. 8, ¶ 28).  Millions of people around the world have accessed

---

[3] While Plaintiffs' complaint contains allegations and claims regarding both audio and audiovisual files, the court will follow the convention employed by the parties and will primarily refer to the audiovisual content as shorthand for both.  Plaintiffs' request for relief as to audio content does not differ in a material way from its request as to audiovisual content, at least for purposes of this motion.

the online audiovisual content that Harvard makes freely available (Compl. at pp. 1, 8, 12, ¶¶ 1, 28, 41-42).

Plaintiffs allege that some audiovisual content appears on websites and platforms maintained and controlled by Harvard, such as Harvard Extension School and Open Learning Initiative, Peabody Museum of Archaeology and Ethnology, Institute of Politics John F. Kennedy Jr.'s Forum, and the Woodberry Poetry Room, while some audiovisual content is presented on third party platforms such as YouTube, iTunes U, and SoundCloud (Compl. at pp. 8-9, ¶¶ 28-29).  Only a fraction of the online content that Harvard makes available has timely, accurate captioning (Compl. at p. 4, ¶ 8).  Some captioning is so inaccurate as to make the content inaccessible (Compl. at p. 10, ¶ 31).

On February 12, 2015, Plaintiffs filed this two-count lawsuit against Harvard.  Plaintiffs claim that Harvard's failure to provide the captioning necessary to ensure effective communication and an equal opportunity for deaf and hard of hearing individuals to benefit from its online audiovisual content violates the prohibitions against disability-based discrimination codified in Section 504 and Title III (Compl. at pp. 25-29, ¶¶ 88-102).  On November 3, 2016, the court denied Harvard's motion to dismiss, concluding that Plaintiffs had made out plausible claims for relief under Section 504 and Title III (Dkt. Nos. 50, 77).  After Harvard answered Plaintiffs' complaint (Dkt. No. 82), the parties spent approximately a year in settlement talks and mediation to resolve or narrow the issues.  When no agreement could be reached, Harvard filed this motion.

II.     DISCUSSION

A.  Statutory and Regulatory Background

The court previously set out the statutory and regulatory background that governs this case, as follows:

> "It is the purpose of both the ADA and the Rehabilitation Act to provide a coherent framework and consistent and enforceable standards for the elimination of discrimination against persons with disabilities." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 133 (D. Mass. 1997) (citing *Thomas v. Davidson Acad.,* 846 F. Supp. 611, 620 (M.D. Tenn. 1994)).  Section 504 and the ADA are "frequently read in sync." *Id*.  Section 504, which is applicable to entities that receive federal funding, "was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities." *Id*. (quoting *Helen L. v. DiDario*, 46 F.3d 325, 330 (3d Cir. 1995)).  Through the ADA, Congress "extended the non-discrimination principles required of institutions receiving federal funds by the Rehabilitation Act to a much wider array of institutions and businesses." *Id*. (citing *Easley v. Snider*, 841 F. Supp. 668, 672 (E.D. Pa. 1993), *rev'd on other grounds*, 36 F.3d 297 (3d Cir. 1994)).  The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Olmstead v. Zimring*, 527 U.S. 581, 589 (1999) (quoting 42 U.S.C. § 12101(b)(1)).
>
> Section 504 provides as its general rule that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…."  29 U.S.C. § 794(a).  A "program or activity" includes "all of the operations of – … a college, university, or other postsecondary institution."  29 U.S.C. § 794(b)(2)(A).  One of the explicit policies underlying the enactment of Section 504 was to ensure that "all programs, projects, and activities receiving assistance … [are] carried out in a manner consistent with the principles of … respect for the privacy, rights, and equal access (including the use of accessible formats), of … individuals [with disabilities]."  29 U.S.C. § 701(c)(2).
>
> Department of Justice[4] ("DOJ") and Department of Education[5] ("DOE") regulations flesh out Section 504's general rule.  The regulations forbid federal fund recipients from "directly or [indirectly,] through contractual, licensing, or other arrangements, on the basis of handicap" denying a qualified handicapped person "the opportunity to participate in or benefit from the aid, benefit, or service;" affording a qualified handicapped person "an opportunity to participate

---

[4] DOJ is responsible for coordinating the implementation of Section 504 among the various federal agencies that extend financial assistance.  Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980).  It has issued regulations in furtherance of that responsibility.  *See* 28 C.F.R. §§ 41.1 – 41.58.

[5] DOE has issued regulations implementing Section 504 as to the programs and activities to which it provides assistance.  *See* 34 C.F.R. §§ 104.1 – 104.61.  DOE's regulations must be consistent with the DOJ's coordination regulations.  28 C.F.R. § 41.4(a).

in or benefit from the aid, benefit, or service that is not equal to that afforded others;" and providing a qualified handicapped person with an "aid, benefit, or service that is not as effective … as that provided to others." 28 C.F.R. § 41.51(b)(1)(i)-(iii); 34 C.F.R. § 104.4(b)(i)-(iii).  In line with Section 504's goal of promoting equal access, DOJ regulations require federal fund recipients to "take appropriate steps to ensure that communications with their applicants, employees, and beneficiaries are available to persons with impaired vision and hearing." 28 C.F.R. § 41.51(e).  DOJ regulations also require recipients of federal funds to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." *Id*. § 41.53.  Both sets of regulations define a "qualified handicapped person" as "a handicapped person who meets the essential eligibility requirements for the receipt of such services." 28 C.F.R. § 41.32(b), 34 C.F.R. § 104.3(l)(4).

In the ADA, Congress set forth prohibitions against disability-based discrimination in employment (Title I, 42 U.S.C. §§ 12111-12117), public services furnished by governmental entities (Title II, 42 U.S.C. §§ 12131-12165), and public accommodations provided by private entities (Title III, 42 U.S.C. §§ 12181-12189).  This case concerns Title III, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns … or operates a place of public accommodation." 42 U.S.C. § 12182(a).  Private schools, including undergraduate and postgraduate institutions, and other places of education, are public accommodations. *Id*. § 12181(7)(J).  Title III prohibits public accommodations from discriminating against the disabled by, "directly, or through contractual, licensing, or other arrangements," denying individuals on the basis of disability the opportunity "to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," or providing them with an "opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." *Id*. § 12182(b)(1)(A)(i)-(ii).  *See also* 28 C.F.R. § 36.202(a)-(b).

Among the various discriminatory effects Congress intended the ADA to remedy were those resulting from communication barriers faced by individuals with communication disabilities, including hearing, vision, and speech impairments.  42 U.S.C. § 12101(a)(5).  The ADA uses the term "auxiliary aids and services" to refer to the means or methods by which public accommodations can effectively communicate with people who have communication disabilities. *Id*. § 12103(1).  *See also* 28 C.F.R. § 36.303.  The ADA establishes that it is discriminatory for a public accommodation to fail "to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the

good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). *See also* 28 C.F.R. § 303(a). DOJ implementing regulations equate "undue burden" with "significant difficulty or expense." 28 C.F.R. § 36.303(a). The regulations further provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Even where the "provision of a particular auxiliary aid or service by a public accommodation would result in a fundamental alteration in the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or in an undue burden, i.e., significant difficulty or expense, the public accommodation [still must] provide an alternative auxiliary aid or service, if one exists, that would not result in an alteration or such burden but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the goods, services, facilities, privileges, advantages, or accommodations offered by the public accommodation." *Id.* § 36.303(g). The regulations define the term "auxiliary aids and services" to include, among other things, "open and closed captioning, including real-time captioning; … or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." *Id.* § 36.303(b).

*Nat'l Assoc. of the Deaf v. Harvard Univ.*, Case No. 3:15-cv-30023-MGM, 2016 WL 3561622, at *2-3 (D. Mass. Feb. 9, 2016).

With this background in mind, the court turns to the contentions in Defendant's Motion.

B. <u>Motion for Judgment on the Pleadings</u>

"A motion for judgment on the pleadings bears a strong family resemblance to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and these two types of motions are treated in much the same way." *Kando*, 880 F.3d at 58. The primary difference between the two is that a motion under Rule 12(c) "implicates the pleadings as a whole." *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54–55 (1st Cir. 2006). "[T]he court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's behoof." *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006). "Judgment on the pleadings should be allowed only if the properly considered facts conclusively establish that the movant is entitled to the relief sought." *Kando*, 880 F.3d at

58 (citing *R.G. Fin. Corp.*, 446 F.3d at 182). "Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Aponte-Torres*, 445 F.3d at 54.

### 1. Title III of the ADA

At the motion to dismiss stage, the court held that the complaint successfully stated a claim under the ADA for failure to accommodate, observing that

> Plaintiffs allege that Harvard – a public accommodation – has discriminated against deaf and hard of hearing individuals by failing to provide auxiliary aids and services – specifically, captioning – necessary to ensure effective communication and equal access to its online audiovisual content. In other words, Plaintiffs' theory of disability-based discrimination under the ADA is for failure to reasonably accommodate. This theory is cognizable under the ADA….

*Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at *10 (citing *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014)). The court characterized this suit as a "prototypical auxiliary aids case. Plaintiffs have alleged that Harvard provides a service – making online video content available to the public for free – which is inaccessible to the deaf and hard of hearing because of Harvard's failure to provide captioning." *Id.*, at *12. For purposes of its motion to dismiss, Harvard "'assume[d] arguendo that Title III applie[d] to its websites.'" *Id.*, at *4 n.5. Harvard now revokes this assumption, contending that Plaintiffs' ADA claim is inadequately pled because Harvard's websites are not themselves "*place[s]* of public accommodation," and that Plaintiffs fail to allege "a sufficient nexus with a good or service provided at a physical location" (Dkt. No. 141 at 2).

Title III of the ADA provides that "[t]he following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce – … (J) a nursery, elementary, secondary, undergraduate, or postgraduate private

school, or other place of education."  42 U.S.C. § 12181(7).  Harvard agrees that it is a "public

accommodation" within the meaning of Title III, which sets forth a general prohibition against

discrimination by public accommodations by providing that "[n]o individual shall be

discriminated against on the basis of disability in the full and equal enjoyment of the goods,

services, facilities, privileges, advantages, or accommodations of any place of public

accommodation by any person who . . . operates a place of public accommodation."  42 U.S.C. §

12182(a).  Harvard asserts that, to give meaning to each word in the statute, a "place" of public

accommodation must be an actual physical location and, to successfully state a claim, a Title III

plaintiff must plead a sufficient nexus to goods or services offered to the public in a physical

location, which Plaintiffs have not done.  The First Circuit's decision in *Carparts Distribution*

*Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, 37 F.3d 12 (1st Cir.

1994), Harvard contends, did not discard this physical location requirement, because the First

Circuit was not required to decide in *Carparts* whether, as some other courts have held, Title III

requires a connection to goods or services offered in a public accommodation's physical location

(Dkt. No. 141 at 2-8).  Plaintiffs respond that no nexus is required between a public

accommodation's allegedly inaccessible services and a physical location in this circuit, but, even

if one is, Harvard is a physical place and its online public offerings are among its services (Dkt.

No. 147 at 4).

*Carparts* addressed the question of whether the ADA's prohibition on discrimination by a

public accommodation on the basis of disability applied to a lifetime cap on health benefits for

AIDS-related illnesses in a medical reimbursement plan offered by the defendants.  *Carparts*, 37

F.3d at 14.  Dismissing plaintiffs' claims, the district court held that Title III of the ADA only

applied to public accommodations that were "actual physical structures with definite physical

boundaries which a person physically enters for the purpose of utilizing the facilities or obtaining services therein." *Id.* at 18 (internal quotation omitted).  The First Circuit reversed the district court, holding that the "plain meaning of the terms do not require 'public accommodations' to have physical structures for persons to enter." *Id.* at 19.  The court went on to observe that even if the language of Title III was ambiguous, that ambiguity, "considered together with agency regulations and public policy concerns, persuades [the court] that the phrase is not limited to actual physical structures." *Id.*  This pronouncement was not dicta because the good or service to which the *Carparts* plaintiffs sought access – an insurance plan structured so that it did not discriminate against an HIV-positive individual – was a good or service unconnected to any physical location operated by the defendants.

The Second and Seventh Circuits have similarly interpreted Title III's general rule against disability discrimination as reaching beyond physical locations of public accommodations.  In 1999, citing *Carparts*, the Second Circuit rejected the defendant insurance company's argument that Title III was only intended to ensure that the disabled have physical access to an insurance company's offices, not freedom from discrimination in its underwriting. The statute, the court held, "was meant to guarantee … more than mere physical access." *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32 (2d Cir. 1999), *opinion amended on denial of reh'g*, 204 F.3d 392 (2d Cir. 2000).  That same year, the Seventh Circuit held that the "core meaning" of Title III's general rule against disability discrimination was

> plainly enough, . . . that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space, . . .) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.

*Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (citing *Carparts,* 37 F.3d at 19).

Other circuits have parted company with the First, Second, and Seventh Circuits, concluding that the phrase "place of public accommodation" in Title III requires "some connection between the good or service complained of and an actual physical place." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000). *Accord Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 n.23 (5th Cir. 2016) ("In following the Third, Sixth, and Ninth Circuits, we acknowledge our departure from the precedents of the First, Second, and Seventh Circuits, which have interpreted the term "public accommodation" to extend beyond physical places."); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613–14 (3d Cir. 1998) (noting that by following Sixth Circuit precedent, the Third Circuit "parted company" with the First Circuit, which had held that "Title III is not limited to physical structures"); *Stoutenborough v. Nat'l Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995).[6] *See also Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 388-393 (E.D.N.Y. 2017) (describing circuit split).

This split in the circuits is premised to some extent on the invocation of competing canons of statutory construction. There are twelve "public accommodation" categories in the statute. *See* 42 U.S.C. § 12181(7). Category F includes an illustrative list of service

---

[6] In *Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279, 1283 (11th Cir. 2002), the Eleventh Circuit concluded that the plaintiffs had successfully pled a Title III claim when they alleged an "intangible" barrier, i.e. an eligibility requirement or screening policy, that prohibited their full access and enjoyment of a good or service (a gameshow) at a place of public accommodation. District courts in the Eleventh Circuit have cited this decision as support for the rule that there must, at minimum, be some connection alleged between an online service and an actual physical location operated by the defendant. *See, e.g., Gil v. Winn-Dixie Stores, Inc.*, 257 F. Supp. 3d 1340, 1348 (S.D. Fla. 2017).

establishments, those being "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment." § 12181(7)(F).  The First, Second, and Seventh Circuits, viewing the list of service establishments in conjunction with agency regulations, legislative history, and the broad policy goals of the ADA, concluded that the inclusion of "travel service" in the list of service establishments meant that Congress "contemplated that 'service establishments' include[d] providers of services which do not require a person to physically enter an actual physical structure." *Carparts*, 37 F.3d at 19.  *Accord Pallozzi*, 198 F.3d at 32–33; *Mut. of Omaha Ins. Co.*, 179 F.3d at 558–59.  The Third, Fifth, Sixth, and Ninth Circuits, relying on the principle of *noscitur a sociis* ("known by its associates"), concluded that because "[e]very term listed in § 12181(7) and subsection (F) is a physical place open to public access," a place of public accommodation must be, or have a connection to, a physical place.  *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997).  *Accord Magee*, 833 F.3d at 534–35; *Weyer*, 198 F.3d at 1114; *Ford*, 145 F.3d at 613–14.

Harvard does not dispute that *Carparts* is binding on this court, nor does Harvard dispute that some services offered online are subject to Title III's general rule prohibiting discrimination by public accommodations.  Relying on cases decided by district courts in other circuits that have held that website accessibility claims rise or fall depending on whether the challenged website has a nexus to a service provided in a public accommodation's bricks and mortar location, *see, e.g., Gil*, 257 F. Supp. 3d at 1348, Harvard argues that a nexus to a physical place is required by Title III and contends that *Carparts* did not consider and, thus does not rule out, such a nexus requirement.  Harvard's argument falls short.  The contention that *Carparts* did not

discard a nexus requirement is meaningless on its own and incorrect in context.  Only "circuits that have concluded that places of public accommodation must be physical spaces have held that the goods and services provided by a public accommodation must have a sufficient nexus to a physical place in order to be covered by the ADA." *Id.*  Further, Harvard fails to acknowledge that the First Circuit's broad pronouncement that to "limit the application of Title III to physical structures which persons must enter to obtain good and services would run afoul of the purposes of the ADA," *Carparts*, 37 F.3d at 20, was made in the context of considering whether plaintiff had stated a disability discrimination claim when that claim had no nexus to any physical location operated by the defendants.  Harvard's argument echoes the reasoning of the appeals courts that have "parted ways" with the First Circuit, s*ee, e.g., Parker*, 121 F.3d at 1014 (stating that "[t]o interpret these terms as permitting a place of accommodation to constitute something other than a physical place is to ignore the text of the statute"), which this court cannot do.

Even assuming arguendo that such a nexus is required, then, drawing all reasonable inferences in Plaintiffs' favor, they have pled such a nexus sufficiently to defeat Defendant's Motion.  Harvard operates in a bricks and mortar location (Dkt. No. 141 at 10).  Plaintiffs allege that online content Harvard has made available to the general public but failed to make accessible to deaf and hard of hearing individuals includes Harvard@Home presentations designed to "'bring [users] inside the Harvard classroom to hear current, real-life lectures or provide [them] with a front-row seat at recent University panels, Alumni College forums, and other special events'" (Compl. at p. 15, ¶¶ 47-48); free, noncredit courses offered through the Harvard Extension School (Compl. at pp. 15-16, ¶ 49); and videos with aural content in the archives of Harvard's Peabody Museum of Archaeology and Ethnology, Harvard's Natural History Museum, the Institute of Politics John F. Kennedy Jr. Forum, Harvard's Life Sciences

Outreach Program, and Harvard's Woodberry Poetry Room (Compl. at pp. 16-18, ¶¶ 50-51, 54-56).  It may be inferred that this online content is the same as a good or service that is, or was, also available at one or more physical locations at Harvard.  *See Gil*, 257 F. Supp. 3d at 1349.  Contrary to Harvard's contention, Plaintiffs have pled the existence of inaccessible content on websites that has "a nexus with on-campus activities" (Dkt. No. 141 at 12 n.5).  *Carparts* and the contents of the complaint do not leave room for Harvard's argument.

The court has already rejected Harvard's contention that Plaintiffs have failed to state a claim under the ADA insofar as their complaint extends to content that Harvard "merely hosts" (Dkt. No. 141 at 23).  As it did before, Harvard relies on cases involving movie theater captioning, *see, e.g., Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666 (9th Cir. 2010), and the general principle that "the ADA 'does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided.'"  *Id.* at 671 (quoting *Weyer*, 198 F.3d at 1115).  *Harkins* held that *Weyer* did not limit the Title III requirement "that a public accommodation provide auxiliary aids and services; the requirement that establishments provide auxiliary aids and services limits *Weyer*'s general rule that public accommodations do not have to provide different services for the disabled."  *Id.* at 672.  *See Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at *12.  The DOJ regulations state as a general principle regarding the provision of auxiliary aids and services that:

> [a] public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.

28 C.F.R. §36.303(a).  The regulations further provide, in provisions that govern the obligations

of movie theaters to provide auxiliary aid and services, that "[a] public accommodation shall

ensure that its movie theater auditoriums provide closed movie captioning and audio description

whenever they exhibit a digital movie that is distributed with such features."  28 C.F.R. §

36.303(g)(2).  A movie theater's obligation in the auxiliary goods and services arena is governed

by a specific provision that controls over the more general obligation of public accommodations

to "take those steps that may be necessary to ensure that no individual with a disability is

excluded," § 36.303(a), from availing him or herself of goods and services offered by a public

accommodation.  *Cf. Bloate v. U.S.*, 559 U.S. 196, 207 (2010) (stating that, as a matter of

statutory interpretation, a specific provision will apply over a provision of more general

application).  Neither *Harkins* nor the DOJ regulations can be read to state the general principle –

argued for by Harvard – that a public accommodation has no obligation to make content that

originates with a third party accessible to disabled individuals.  The DOJ regulations simply do

not limit a public accommodation's obligations as to online content that it chooses to host on its

websites and platforms.  This "does not mean that Harvard must provide captioning as a matter

of law.  Harvard … may be able to demonstrate that providing captioning, or any other available

auxiliary aid or service, 'would fundamentally alter the nature' of its service or result in an undue

burden."  *Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at *12 (quoting 42 U.S.C. §

12182(b)(2)(A)(iii)).  This is, however, a question of fact unsuitable for resolution on the

pleadings.  *See Harkins*, 603 F.3d at 675.

    For the reasons set forth above, the court declines to grant Harvard judgment on the

pleadings on Plaintiffs' ADA claim for the reasons advanced in Defendant's Motion.

    2.  <u>Section 504</u>

In its motion for judgment on the pleadings, Harvard reiterates its assertion, rejected on its motion to dismiss, that the complaint fails to state a claim under Section 504's implementing DOE regulations, which state that federal fund recipients may not deny qualified handicapped individuals, "directly or through contractual, licensing, or other arrangements," the opportunity to participate in or benefit from aids, benefits, and services provided by a federal funds recipient. *See* 34 C.F.R. § 104.4(b)(1)(i).

As Plaintiffs point out, this court has ruled that:

> [T]he general provisions of DOE's regulations . . . support Plaintiffs' theory of discrimination.  Section 104.4 prohibits federal fund recipients from denying qualified handicapped persons the opportunity to participate in or benefit from provided aids, benefits, or services; … and [from] providing qualified handicapped persons with aids, benefits, or services that are not as effective as those that are provided to others.  …  In other words, these regulations are consistent with the requirement of "meaningful access," and . . . Plaintiffs have adequately pleaded a lack of meaningful access.

*Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at *7.  For reasons explained at length, the court "decline[d] to draw any inference from the fact that § 104.4 does not explicitly address the responsibilities of federal fund recipients vis-á-vis website accessibility."  *Id.*

Pointing to the identically phrased DOJ regulations promulgated under Title II of the ADA, Harvard contends that the "aids, benefits, and services" language in § 104.4 of the DOE's regulations implementing Section 504 covers a narrower range of functions than does the statute's broad "program or activity" language.  Relying on *Noel v. New York City Taxi & Limousine Commission*, 687 F.3d 63 (2d Cir. 2012), and *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015), *vacated as moot sub nom. Ivy v. Morath*, 137 S. Ct. 414 (2016), Harvard argues that it merely furnishes websites or platforms on which third parties post content that Harvard does not

provide or control and that this content is not an aid, benefit, or service of Harvard (Dkt. No. 141 at 14).

In *Noel*, the plaintiffs sued the New York City administrative agency that was responsible for licensing and regulating taxis on the grounds that most taxicabs were inaccessible for the wheelchair-bound.  The Second Circuit concluded that while Title II of the ADA, which addresses discrimination by public entities, prohibited the defendants from "refusing to grant licenses to persons with disabilities who are otherwise qualified," it did "not assist persons who are consumers of the licensees' product."  *Noel*, 687 F.3d at 69.  Similarly, in *Ivy*, the Fifth Circuit held that because driver education was not a service of the state entity responsible for licensing private driver education schools, the licensing entity could not be held liable for discriminatory conduct by the driver education schools.  *Ivy*, 781 F.3d at 256.  The courts in *Noel* and *Ivy* relied in significant part on the DOJ's Title II Technical Assistance Manual ("TAM"), which provides that "[t]he State is not accountable for discrimination in the employment or other practices of XYZ company [an entity which the State licenses], if those practices are not the result of requirements or policies established by the State."  TAM, § II-3.7200, available at https://www.ada.gov/taman2.html#II-3.7200 (last visited Mar. 20, 2019).  *See Ivy*, 781 F.3d at 256; *Noel*, 687 F.3d at 69-70.

Harvard's reliance on these cases is not persuasive.  Plaintiffs have not alleged that Harvard functions as a regulator of its websites and platforms.  Plaintiffs allege that some unquantified amount of the inaccessible content on Harvard's websites and platforms is created or produced directly by Harvard, not by a third party (Compl. at p. 10, ¶¶ 9-10).  And, in the absence of a factual record, the role Harvard plays in connection with content that Harvard itself may not create or produce is a matter of conjecture.  Moreover, Plaintiffs allege, as to all of

Harvard's online content, that Harvard "uses administrative methods, practices, procedures and policies" that result in a lack of captioning or inaccurate captioning (Compl. at p. 11, ¶¶ 33-39). The DOJ, in TAM, as well as the courts in the *Noel* and *Ivy* cases, recognize that public entities may not establish requirements or policies governing the activities of the private actors they regulate that would result in discrimination against individuals with disabilities.  TAM, § II-3.7200; *Ivy*, 781 F.3d at 256 (stating that "a public entity cannot 'discriminate directly or through contractual, licensing, or other arrangements'" (quoting 28 C.F.R. § 35.130(b)(1)); *Noel*, 687 F.3d at 687 F.3d at 70 (stating that TAM provides that licensing standards are covered by Title II although the licensee's activities themselves are not covered).  Plaintiffs allege, albeit on information and belief, that Harvard has done so.

Moreover, the regulations DOE has promulgated under Section 504 do not express the limits on responsibility that Harvard claims exist.  The DOJ Title II ADA regulations that set forth the general prohibition against discrimination include the limitation that a public entity may not discriminate against a qualified handicapped individual in the administration of a licensing or certification program but "[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part."  28 C.F.R. § 35.130(b)(6).  DOE Section 504 regulations lack a parallel provision.  Instead, the general prohibition against discrimination provides without limitation that a federal aid recipient may not discriminate in providing any aid, benefit or service to a disabled individual "directly or through contractual, licensing, or other arrangements."  34 C.F.R. § 104.4(b)(1)(i)-(vii).  In the absence of any persuasive support for limiting the general prohibition against discrimination in the provision of aids, services, and benefits to the disabled under Section 504, Harvard's contentions in its motion for judgment on the pleadings fail.  For the reasons previously stated, *see Nat'l Assoc. of the*

*Deaf*, 2016 WL 3561622, at \*5-10, and those stated herein, Plaintiffs have sufficiently alleged their claim under Section 504.

### 3.  Third-Party Websites

The complaint extends beyond Harvard's own websites and platforms to websites hosted by third parties, including Harvard on YouTube, Harvard on iTunes U; and Harvard on SoundCloud (Compl. at p. 9, ¶ 29(a)-(c)).  Harvard asserts that even if Harvard's websites qualify as places of public accommodation under Title III (which it does not concede), it cannot be responsible under Title III or Section 504 for content posted on these third-party websites (Dkt. No. 141 at 20-21).  Implementing regulations applicable to Title III and Section 504 prohibit disability discrimination by a public accommodation or a federal fund recipient "directly or through contractual, licensing, or other arrangements."  28 C.F.R. § 36.202(b); 34 C.F.R. § 104.4(b)(1).  Forbidden discrimination extends to denial of participation in "any program or activity" of an entity that receives federal assistance, 34 C.F.R. § 104.4(a), or the "goods, services, facilities, privileges, advantages, or accommodations" of a place of public accommodation.  28 C.F.R. § 36.202(a).  The complaint alleges violations of Title III and Section 504 by Harvard as to content on these third-party websites.  It may be that Harvard does not arrange for inaccessible content to appear on these platforms, or that Harvard lacks control over how content is displayed on third-party websites, or that captioning would not provide meaningful access to content on third-party websites for deaf and hard of hearing individuals, or that requiring captioning would fundamentally alter the nature of the service or result in an undue burden.  Those are questions raised by Harvard's affirmative defenses.  The court cannot make such determinations in the absence of a more developed factual record.  *See Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at \*12.

C.  Communications Decency Act Immunity

Finally, Harvard argues that it is entitled by the Communications Decency Act of 1996, 47 U.S.C. § 230 ("Section 230" or "CDA"), to immunity as to so much of Plaintiffs' complaint as seeks an accommodation with respect to content created by third parties that is posted on Harvard's websites and platforms or embedded in content posted on Harvard's websites and platforms but hosted elsewhere on the Internet.

1.  The Legal Framework

Section 230 provides, in pertinent part:

(c) Protection for 'Good Samaritan' blocking and screening of offensive material

> (1) Treatment of publisher or speaker
> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

Section 230(c)(1) "shields website operators from being 'treated as the publisher or speaker' of material posted by users of the site, 47 U.S.C. § 230(c)(1), which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred.'" *Jane Doe No. 1. v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).  The CDA defines an interactive computer service ("ICS") as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including … *such systems operated or services offered by libraries or educational institutions*."  47 U.S.C. § 230(f)(2) (emphasis supplied).  *See Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 318 (1st Cir. 2017).  An "information content provider" ("ICP") is defined, in turn, as "any person or entity that is responsible, in whole or in part, for the creation or development of

information provided through the Internet or any other interactive computer service."  47 U.S.C.

§ 230(f)(3).  "This is a broad definition, covering even those who are responsible for the

development of content only 'in part.'"  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d

413, 419 (1st Cir. 2007).  "A key limitation in Section 230 … is that immunity only applies when

the information that forms the basis for the … claim has been provided by '*another* information

content provider.' … Thus, an interactive computer service provider remains liable for its own

speech."  *Id.* (quoting 47 U.S.C. § 230(c)(1); citing *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d

1257, 1262-63 (N.D. Cal. 2006)).  "[T]here may be several information content providers with

respect to a single item of information (each being 'responsible,' at least 'in part,' for its

'creation or development')."  *Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th

Cir. 2009).

"Congress enacted [the CDA] partially in response to court cases that held internet

publishers liable for defamatory statements posted by third parties on message boards maintained

by the publishers."  *Backpage.com*, 817 F.3d at 18.  "In specific statutory findings, Congress

recognized the Internet and interactive computer services as offering 'a forum for a true diversity

of political discourse, unique opportunities for cultural development, and myriad avenues for

intellectual activity.'"  *Zeran*, 129 F.3d at 330 (quoting section 230(a)(3)).  "Congress made a

policy choice … not to deter harmful online speech through the separate route of imposing tort

liability on companies that serve as intermediaries for other parties' potentially injurious

messages."  *Id.* at 330-31.  Accordingly, "[t]here has been near universal agreement that section

230 should not be construed grudgingly."  *Backpage.com*, 817 F.3d at 18 (citing *Doe v. MySpace,

Inc.,* 528 F.3d 413, 418 (5th Cir. 2008); *Lycos*, 478 F.3d at 419; *Almeida v. Amazon.com, Inc.*,

456 F.3d 1316, 1321-22 (11th Cir. 2006); *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119,

1123 (9th Cir.2003)).  The broad construction accorded to Section 230(c) has resulted in the

recognition by courts across the country that "'many causes of action might be premised on the

publication or speaking of what one might call 'information content.'" *Id.* at 19 (quoting

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009)).

> Thus, courts have invoked the prophylaxis of section 230(c)(1) in connection with
> a wide variety of causes of action, including housing discrimination, *see Chic.
> Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d
> 666, 671-72 (7th Cir. 2008), negligence, *see Doe*, 528 F.3d at 418, *Green v. Am.
> Online (AOL)*, 318 F.3d 465, 470-71 (3d Cir. 2003), and securities fraud and
> cyberstalking, *see Lycos*, 478 F.3d at 421-422.

*Id. See also Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 Fed. App'x. 526, 526 (9th Cir. 2017)

("[W]e have found no authority, and [plaintiff] fails to cite any authority, holding that Title II of

the Civil Rights Act of 1964 provides an exception to the immunity afforded to [defendant]

under the CDA.").

Under *Lycos*, for Harvard to avail itself of the immunity set forth in Section 230(c)(1),

"'(1) [Harvard] must be a provider or user of an [ICS]; (2) the Plaintiffs' claim [must be] based

on information provided by another [ICP]; and (3) the claim [must] treat [Harvard] as the

publisher or speaker of that information.'" *Small Justice, LLC*, 873 F.3d at 318 (quoting *Lycos*,

478 F.3d at 418).  If Plaintiffs' claims treat Harvard in the capacity of an ICS publishing a third

party's content, then, "as the publisher of a particular posting, immunity applies not only for

[Harvard's] decisions with respect to that posting, but also for its inherent decisions about how to

treat postings generally." *Lycos*, 478 F.3d at 422.

### 2.  CDA Immunity and This Case

The complaint defines "Harvard's Online Content," which is the basis of Plaintiffs'

claims, as online content that Harvard produces and/or makes available on its platforms and

seeks to hold Harvard responsible regardless of whether Harvard creates or produces the content

21

that either completely lacks captioning or lacks accurate captioning (Compl. at pp. 10-11, ¶¶ 28, 36).  Harvard argues that it is entitled to CDA immunity to the extent Plaintiffs seek to hold Harvard liable for providing server space and websites and platforms for content posted by third parties and for embedded content for which Harvard's websites and platforms merely provide enabling tools that display others' content (Dkt. No. 141 at 17).  Plaintiffs respond, first, that CDA immunity only applies to the content of online material and has no application to the failure to accommodate that is the basis of their claims, and, second, that the CDA does not provide immunity for an entity like Harvard that controls who can post on its websites and platforms (Dkt. No. 147 at 18).

Plaintiffs have not pointed to any support for their claim that the CDA does not apply when a plaintiff claims disability discrimination based on a lack of access rather than on the content of speech, and the court has found none.  The CDA exempts certain laws from its reach. Federal and state antidiscrimination statutes are not exempted.  *See* 47 U.C.S. § 230(e) (providing that the CDA has no effect on criminal law, intellectual property law, communications privacy law, sex trafficking laws, or state laws that are consistent with the CDA).  The Seventh Circuit considered and rejected an argument similar to the argument made by Plaintiffs.  In its suit against Craigslist, the plaintiff Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") argued that "'nothing in § 230's text or history suggests that Congress meant to immunize an ISP from liability under the Fair Housing Act.  In fact, Congress did not even remotely contemplate discriminatory housing advertisements when it passed § 230.'" *Chicago Lawyers' Comm. for Civil Rights Under Law*, 519 F.3d at 671.  The Seventh Circuit acknowledged the absence of evidence that Congress considered the Fair Housing Act or the CDA's possible effect on housing discrimination when it passed the statute,

but it rejected the Lawyers' Committee's contention, reasoning that, in enacting the CDA, Congress intentionally passed a general statute and that "[t]he question [wa]s not whether Congress gave any thought to the Fair Housing Act, but whether it excluded § 3604(c) [the Fair Housing Act prohibition against discrimination] from the reach of § 230(c)(1)." *Id.* (citing *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 126-127 (1974)).

Plaintiffs' plea for access to aural content available on the Internet is compelling. So were the claims made by the victims of sex trafficking in *Backpages.com*, as the First Circuit recognized. *Backpage.com*, 817 F.3d at 15. Just as the plaintiffs in *Backpages.com* could point to the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. §§ 1591, 1595, as a congressional acknowledgement of the evils of sex trafficking and their right to protection, *Backpage.com*, 817 F.3d at 15, Plaintiffs in the instant case can point to Section 504 and Title III as an acknowledgement of the vital importance of equal access to goods and services for individuals with disabilities, including deaf and hard of hearing individuals. As the First Circuit observed in *Backpages.com*, "[t]hese laudable legislative efforts do not fit together seamlessly, and this case reflects the tension between them." *Id.* In *Backpages.com*, faced with this tension, the First Circuit reaffirmed the view it expressed in *Lycos* about the breadth of the immunity conferred by Section 230. That view, which is binding on this court, does not leave room for Plaintiffs' contention that the CDA simply does not apply to discrimination claims seeking accommodation for the disabled.[7]

---

[7] Plaintiffs' reliance on the Seventh Circuit opinions that decline to read Section 230 as providing broad immunity for website operators is misplaced (Dkt. No. 147 at 21) in view of the First Circuit's controlling pronouncements. *See, e.g., Backpage*, 817 F.3d at 19; *Lycos*, 478 F.3d at 415 ("In Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230, Congress has granted broad immunity to entities … that facilitate the speech of others on the Internet.").

Turning to the three-part inquiry set out in *Lycos*, Plaintiffs allege that Harvard "controls, maintains and/or administers webpages, websites, and other Internet locations ('Harvard Platforms') on which content is made available to the general public," (Compl. at p. 8, ¶ 28) and that Harvard's websites and platforms "enable[] computer access by multiple users to [the] computer server[s]" on which the content that is the subject of Plaintiffs' complaint is hosted (Compl. at p. 20, ¶¶ 63-74).  Harvard acknowledges that it hosts platforms to which online content may be uploaded (Answer at pp. 2, 6, ¶¶ 2, 28).  Congress chose to include educational institutions in its definition of ICS providers.  47 U.S.C. § 230(f)(2).  Congress did not, as Plaintiffs suggest in passing, limit its definition of the term "interactive computer services" as that term is applied to libraries and educational institutions (Dkt. No. 147 at 19 n.23).  "'[W]hen [a] statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'"  *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  Plaintiffs allege that Harvard hosts a vast array of online content addressing a wide range of topics.  It is not absurd to treat Harvard as an ICS provider under the CDA.  The pleadings and the statute support Harvard's contention that it functions as an ICS provider "within the meaning of Section 230."  *Lycos*, 478 F.3d at 419 (a website operator is a provider of interactive computer services).

Plaintiffs seek relief as to online content that Harvard creates and/or produces and other online content that it makes available on its websites and platforms (Compl. at p, 29).  Harvard states in its answer that "in many instances it does not create or control the online content" on its platforms (Answer at p. 2, ¶ 2).  To the extent Harvard provides platforms on which third parties post content that Harvard does not create, produce, or substantively alter, *see Doe No. 1 v.*

24

*Backpage, LLC*, Civil Action No. 17-11069-LTS, 2018 WL 1542056, at *1 (D. Mass. March 29, 2018), Harvard is hosting information provided by another ICP.  A fair reading of the complaint is that, while Plaintiffs are seeking relief in connection with content created or produced by Harvard, they are also seeking relief as to content that is created or produced by third parties but is available on a Harvard platform or website, (Compl. at pp. 10, 11 ¶¶ 31, 36, 39), thereby satisfying the second part of the inquiry as to some undefined portion of Harvard's online content.

Whether Section 230 applies "does not depend on the form of the asserted cause of action; rather, it depends on whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another." *Backpage*, 817 F.3d at 19.  To prevail on their Title III and Section 504 claims, Plaintiffs will be required to prove that Harvard discriminated against them by failing to affirmatively accommodate deaf and hard of hearing individuals where an auxiliary aid was necessary to provide such individuals with meaningful access to online content, *Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at *4 (citing *Nunes*, 766 F.3d at 144), that is created or developed by Harvard or that is created or developed by a third party.  This case is a classic auxiliary aids case, and Plaintiffs have adequately alleged liability under Title III and Section 504.  Cases decided by the First Circuit and other circuits, and Congress's decision to include educational institutions in the CDA's definition of ICS providers, however, support the conclusion that holding Harvard liable for the inaccessibility of online content created or developed by a third party when Harvard does not alter that content

would impermissibly "involve treating [Harvard] 'as the publisher' of 'information provided by another information content provider.'"  *Lycos*, 478 F.3d at 422.[8]

That Harvard is alleged to control who can post on its websites and platforms would not divest it of Section 230 immunity.  "'[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred.'"  *Backpage.com*, 817 F.3d at 18 (quoting *Zeran*, 129 F.3d at 330).  The CDA relieves ICS providers from liability when they exercise control such as "blocking and screening of third-party content."  *Id.  See also Craigslist*, 519 F.3d at 669 (recognizing that Section 230 relieves ICSs from liability whether or not they filter third-party postings).  In *Lycos*, the First Circuit closed the door on the argument that an ICS's control over the "construct and operation" of a website could be a basis for liability when a claim treats the ICS as the publisher of third-party content.  *Lycos*, 478 F.3d at 422.  Harvard's "choices about what [third party] content can appear on [its] website[s] and in what form, are editorial choices that fall within the purview of traditional publisher functions" protected by Section 230.  *Backpage.com*, 817 F.3d at 21; *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (rejecting the argument that Facebook did not qualify as an ICS because it could control the content posted on its website; "[t]he short answer is that Congress did not write that additional limitation into the [CDA]").

The remaining question is whether CDA immunity entitles Harvard to any relief on its motion for judgment on the pleadings.  "Preemption under the Communications Decency Act is

---

[8] Plaintiffs' claims under the ADA and Section 504 also remain subject to Harvard's affirmative defenses that providing captioning or another auxiliary aid or service would result in an undue burden or fundamentally alter the nature of its online services.  *See Nat'l Assoc. of the Deaf*, 2016 WL 3561622, at *12 (citing *Harkins*, 603 F.3d at 675).

an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." *Id.* at 1357 (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011)). "Where a court grants a Rule 12(b)(6) or Rule 12(c) motion based on an affirmative defense, the facts establishing that defense must: (1) be 'definitively ascertainable from the complaint and other allowable sources of information,' and (2) 'suffice to establish the affirmative defense with certitude.'" *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008) (quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006)). A plaintiff is "not required to anticipate and plead around affirmative defenses raised by [a defendant]." *Dennett v. Archuleta*, 982 F. Supp. 2d 166, 169 (D.R.I. 2013) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Harvard asks for partial judgment on the pleadings on the basis of Section 230 immunity as to third-party content that Harvard hosts[9] and content embedded in Harvard's audiovisual content that is hosted elsewhere on the Internet.[10] Harvard defines third-party content that it hosts – as opposed to creates or develops or that is embedded – to include content posted by students, individual faculty members, and other scholars (Dkt. No. 141 at 6). Plaintiffs contend that Harvard is entitled to no relief because the complaint adequately alleges that all content posted on Harvard's websites,

---

[9] Hosting content accessible via the Internet requires "(1) static IP (Internet protocol) addresses through which the web sites may be reached …; (2) a high-speed physical connection through which communications pass between the Internet's transmission lines and the web sites; and (3) storage space on a server (a computer and hard disk that are always on) so that the content of the web sites can be accessed reliably." *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003).

[10] Embedding an image on a webpage requires using a code that allows the individual posting content to incorporate an image hosted on a third-party server into a posting. *See Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018). "An embedded image will . . . hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated [posting], a mix of text and images, although the underlying images may be hosted in varying locations." *Id.*

webpages and other platforms is "Harvard's Online Content" and that Harvard is not entitled to

CDA immunity for online content created by individuals such as faculty members and students

who are closely associated with Harvard (Dkt. No. 147 at 17-18).

With one exception addressed below, Harvard's invocation of CDA immunity is

premature.  Plaintiffs, who were not required to anticipate Harvard's affirmative CDA immunity

defense in their complaint, have broadly alleged that Harvard is responsible for the content that is

hosted on its websites and platforms (e.g., Compl. at pp. 8, 11, 15, ¶¶ 28, 33, 48).  As Plaintiffs

point out, Harvard seeks immunity from liability for a "vast array of content" that is wholly

undefined in the record before the court (Dkt. No. 147 at 20).  The court cannot determine as a

matter of law that Harvard is not in some measure a content provider as to information on its

platforms that originates with students, faculty members, or other scholars.  *See, e.g., Blackstone*

*Realty LLC v. Fed. Deposit Ins. Co.*, 244 F.3d 193, 197 (1st Cir. 2001) (stating that, "for

dismissal to be allowed on the basis of an affirmative defense, the facts establishing the defense

must be clear 'on the face of the plaintiffs' pleadings'" (quoting *Aldahonda -Rivera v. Parke*

*Davis & Co.*, 882 F.2d 590, 591 (1st Cir. 1989))); *see also* 47 U.S.C. § 230(f)(3) (defining an

information content provider as "any person or entity that is responsible, in whole or in part, for

the creation or development of information provided through the Internet or any other interactive

computer service").

Even at this stage, however, it is apparent that the CDA will shield Harvard from liability

for offending content (i.e., content that is uncaptioned or is otherwise inaccessible to a deaf or

hard of hearing individual) that is merely embedded within online content produced or created by

Harvard, however "Harvard" is defined for these purposes.  By definition, embedded content is

content hosted on a third-party server that is hyperlinked in its existing form to content that is

hosted on a Harvard platform or website.  *See Goldman*, 302 F. Supp. 3d at 587.  To the extent

such content is not content that was created or developed in whole or in part by Harvard, Harvard

cannot be an information content provider as to embedded content.  *See* 47 U.S.C. § 230(f)(3);

*see also Small Justice, LLC*, 873 F.3d at 322 (concluding that, where the defendant did not alter

the content posted by the third party, the defendant could not "be said to have been 'responsible

for … create[ing] or develop[ing]' that content by reason of having actually authored it, whether

in whole or in part").  Even if Plaintiffs can show that the construction and operation of

Harvard's platforms and websites limit in some way the content that can be embedded in

postings on Harvard's platforms and websites, Harvard would remain a publisher under the CDA

as to embedded content.  *See Backpage.com*, 817 F.3d at 20.  Where Harvard or someone

associated with Harvard is embedding a third party's content that Harvard or someone associated

with Harvard did not create or develop in whole or in part – in other words, is publishing a third

party's content – Harvard is entitled to CDA immunity, *see id.* at 20-23, and to judgment on the

pleadings as to this aspect of Plaintiffs' claims.  *See Klayman*, 753 F.3d at 1357.

    III.   Conclusion

    For the foregoing reasons, the court DENIES in part and GRANTS in part Harvard's

Motion for Judgment on the Pleadings.


Dated:  March 28, 2019          /s/ Katherine A. Robertson
                        KATHERINE A. ROBERTSON
                        United States Magistrate Judge